Denton Alan CRANK, Appellant,

v.

The STATE of Texas, Appellee.

No. 69500.

Court of Criminal Appeals of Texas, En Banc.

Sept. 14, 1988.

Rehearing Denied Oct. 19, 1988.

Don Ervin, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and Eleanor M. McCarthy and Janice M. Krocker, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

OPINION

CLINTON, Judge.

Appellant was charged in a two count indictment with capital murder, as proscribed by V.T.C.A. Penal Code, § 19.03(a)(2). After the State abandoned the first count, the jury found appellant guilty of capital murder as charged in the indictment. The jury answered the special issues submitted to them in the affirmative, and punishment was assessed at death. Article 37.071(b), V.A.C.C.P. Direct appeal to this Court is automatic. Article 37.071(h), V.A.C.C.P. We will affirm.

Appellant raises thirteen points of error in this Court. He does not contest the sufficiency of the evidence. We shall address appellant's grounds of error seriatim.

Appellant's first point of error contends the trial court committed reversible error in denying his motion for dismissal under the Texas Speedy Trial Act. Our recent decision in *Meshell v. State*, 739 S.W.2d 246 (Tex.Cr.App.1987), holding Article 32A.02, V.A.C.C.P., unconstitutional, obviates the need for further discussion of this ground, and it is overruled.

Appellant next raises points of error in which he complains of the admission of several extraneous offenses which preceded the actual capital crime alleged in the indictment. A fairly detailed recitation of the facts surrounding these extraneous offenses, as well as those surrounding the capital crime itself, is necessary in order to facilitate a cogent discussion of these points.

Terry Oringderff (Oringderff), the deceased, was employed by Rice Food Markets. At all times pertinent to this cause, he was employed as one of the managers of a Rice Cash Savers Store [1] (hereinafter Rice) located at 9419 North Freeway (Interstate 45) in north Harris County.

Mary Oringderff (Mary), the deceased's estranged wife, spent the whole day Sunday, January 15, 1984, with the deceased. She was last in his apartment at approximately 7:30 p.m. on Sunday evening, and she indicated that everything was clean and neat and nothing was out of place. The deceased was then wearing a ring bearing a horseshoe studded with diamonds.

At some point between 11:00 p.m. and midnight on that Sunday evening, one of the Oringderff's neighbors noticed that the door to Oringderff's apartment was ajar. The following day, the apartment was found in a state of complete disarray. Cushions had been pulled from the couch, kitchen cabinets and drawers were open, a statue had been overturned, and numerous items were missing.

Oswald Matthews was employed at the Rice store in question, and he arrived for work at approximately 6:50 on the morning of January 16, 1984. Matthews was admitted to the store by Oringderff. Matthews described Oringderff's appearance on that morning as looking "like he had had kind of a rough night," and Matthews noted that Oringderff was not clean shaven. Oringderff was wearing a jacket and Matthews noted a "hump" on his back, and some type of strap around his neck.

Oringderff led Matthews to the meat cooler where the pair encountered a single gunman. The gunman had on a black "Hoss Cartwright type" hat and a dark stocking mask. He was also wearing a green jump suit, Army-type fatigue jacket, gloves and dark orange boots. Matthews thought that the gunman had a beard beneath the stocking mask. The gunman carried a "box-frame 9 millimeter, .38 or .45 caliber automatic" pistol. Matthews was instructed to lie on the floor near the back of the store in an employee lounge area, where he was subsequently frisked and relieved of his billfold by the gunman.

At one point while Matthews was lying on the floor, Oringderff told him to "(d)o as they say. They have kept me all night. They have had me. They found me, kept me at the apartment and brought me down

---

1. The Rice Cash Saver store involved was variously referred to as the Cash Saver Warehouse Food Store, the Warehouse Cash Saver Food Store, and the Rice Warehouse Food Store by various witnesses.

here and ransacked my apartment and they got me wired with explosives." Although Matthews only saw one gunman during the course of the robbery, he testified that Oringderff continuously used the word "they" when referring to the gunman.[2]

Within the next ten to fifteen minutes, Jean Blake, a Rice security employee, Gloria Carreon, a meat wrapper, Hugh Troy Billings, the produce manager and Byron Swindle, the assistant manager, arrived for work. Each employee was met by Oringderff as he or she arrived at the front door and escorted back to the employee area, where the gunman told each employee to lay down on the floor and robbed each one of the contents of their wallet or purse. Additionally, two delivery drivers who had arrived at the Rice store at approximately 7:00 a.m. were also escorted back to the employee lounge area, placed on the floor and robbed at gunpoint. At approximately 7:10 a.m., the gunman moved Matthews, Blake, Carreon, Billings, Swindle, and the two delivery drivers from the floor of the lounge area to the produce cooler. The gunman apparently blocked the door to the produce cooler with empty plastic milk crates, effectively locking the group inside.

At approximately 7:50 a.m., Shirley Jane Poteet, the courtesy booth operator, arrived for work. She went to the back door of the Rice store, as usual, and was admitted by Oringderff. After she entered the store, Poteet noticed the gunman standing just to the right of Oringderff. Oringderff told Poteet that he had seven or eight sticks of dynamite strapped to his back, and instructed her to "do as they say." The gunman searched Poteet, took one hundred and twenty-five dollars from her

pants pocket, and then told her "you know where to go and what to do." Poteet interpreted this as an instruction to proceed to the courtesy booth and open the safes.

The gunman followed Oringderff and Poteet to the courtesy booth area of the store. The door to the courtesy booth was equipped with a fifteen minute time delay lock and the lock had already been deactivated by the time Poteet arrived at the door of the courtesy booth. Within the courtesy booth there were four safes, two of which were readily visible once one entered the booth area, and two of which were hidden beneath floor mats. A fifth safe was located in an adjacent room, generally known as the computer room, which housed the electronic equipment which operated the store's cash registers. Oringderff had the combination to one of the four safes in the courtesy booth, as well as the combination to the safe located in the adjacent electrical equipment room. This safe had apparently not been used since a robbery at the Rice store in November of the prior year. The one safe within the courtesy booth to which Oringderff had the combination contained one thousand dollars in currency and coins which was used to make change during the evening hours after the days' receipts had been placed in the three remaining safes in the courtesy booth. Of the employees at the store that morning, only Poteet had the combinations to the other three safes in the courtesy booth.

The gunman accompanied Poteet and Oringderff into the courtesy booth, and had them place the contents of each of the four safes into a canvas mail bag. When the

---

**2.** Most of the other Rice employees present on the day of the robbery who testified at appellant's trial also indicated that he or she saw only one gunman, with the exception of Shirley Jane Poteet. Poteet testified that she thought she saw a second gunman after she had opened the safes in the courtesy booth and been placed in the produce cooler with the other employees. She indicated that, at that point, a "second" gunman opened the door to the cooler to ask the employees a question regarding the keys to the back door to the store. However, Poteet later said that she thought this was a "second" gunman because the "second" gunman was not wearing the fatigue jacket she had earlier observed on the original gunman, and because the "second" gunman appeared somehow different from the original gunman. Poteet also said that the "second" gunman could have been the original gunman with his jacket removed, and noted that she was extremely nervous during the episode and that she had little opportunity to observe the jump suit worn by the original gunman beneath his fatigue jacket. Hugh Troy Billings said that he only saw "one robber at a time," and that he could not definitely say that he saw two robbers.

mail bag was filled with currency and coins, the gunman directed them to fill a plastic trash can with the remaining money from the safes. As each safe was opened, the gunman said "Oringderff, if there is a gun in there, I'm going to—you're dead." After either Oringderff or Poteet had removed all of the contents from one of the safes, the gunman would look quickly into the safe to ensure that nothing remained inside.

After all four of the safes in the courtesy booth had been emptied, Poteet, Oringderff and the gunman left the courtesy booth and headed for the back door of the Rice store. En route to the back door, the gunman stopped at the produce cooler, removed the plastic milk crates used to block the door closed and motioned Poteet inside. This occurred at approximately 8:10 a.m. When last seen by Poteet, Oringderff was carrying the mail bag filled with currency and walking toward the back door of the store, followed closely by the gunman, who was then dragging the plastic trash can filled with currency and coins. An audit later revealed that the robbery netted either $39,801.12 or $39,801.13. The Rice employees and delivery men were all released from the produce cooler at approximately 9:00 a.m., when a third delivery driver arrived at the store to make a delivery and found no Rice employees available to accept the shipment.

On January 16, 1984, Trent Brandon Hirsch was working as a production supervisor for Turkey Creek Farms on Broze Road and FM 1960, in north Harris County. At approximately 8:30 a.m., Hirsch heard one shot, "real loud, almost like a cannon," followed by five or six more shots approximately three seconds later. Although the area around the nursery was heavily wooded at that time, and it was not unusual to hear gunfire in that area during hunting seasons, Hirsch said that it was unusual to hear gunfire that early in the morning, particularly when it apparently originated from an area that close to the nursery. It was impossible for Hirsch to see the end of Broze road from the area where he was working when he heard the shots due to the trees and underbrush in that area.

Later on the morning of January 16, Harris County Sheriff's Deputy Johnny Freeze found a 1972 Pontiac Grand Prix registered to Terry Oringderff at the end of Broze Road. Next to the car was Oringderff's body. Oringderff had been shot six or seven times. A disposable diaper had been torn in half and taped across Oringderff's face, covering his eyes, nose and mouth. In the immediate vicinity of the body were four empty Remington Peters 9 millimeter shell casings, apparently ejected from the weapon used to kill Oringderff. Found in the loose soil under Oringderff's body were two 9 millimeter slugs which apparently passed through Oringderff's body at the time of the killing.

Freeze testified that the driving distance from the Rice store, where the robbery occurred, to the end of Broze Road, where Oringderff's body was discovered, was 12.6 miles by the most direct route. Freeze also said that the driving time for the trip, traveling at normal highway speeds, was approximately seventeen minutes.

Harris County Medical Examiner Dr. Joseph Jachimczyk testified that Oringderff had sustained two glancing gunshot wounds to the head, and one shot through the mouth which had knocked out a couple of upper teeth and penetrated the tip of the tongue. There was also a gunshot wound through the left hand, which Dr. Jachimczyk characterized as a defensive wound. Finally, there were three gunshot wounds to the back, one to the left of the midline of the body and the other two to the right. These last three wounds were more or less in a line across Oringderff's lower back. Additionally, there were three exit wounds on the left side of Oringderff's chest, again evidencing a more or less linear dispersion. It was not possible to ascertain the order in which the gunshot wounds were sustained in this case. The cause of death was the three gunshot wounds to the victims' back, as the bullets penetrated the heart and both lungs, and caused extensive internal hemorrhaging. Dr. Jachimczyk indicated that, taken separately, any of the three gunshot wounds to the lower back would have been fatal. Given the severity of the

wounds, Dr. Jachimczyk estimated that Oringderff could have lived a maximum of ten to fifteen minutes following the shooting.

Later on the morning of the 16th, Houston Police officers searched Oringderff's apartment and found that it had been ransacked. Mary testified that Terry Oringderff was a very neat housekeeper, and that on the evening of the 15th of January, the apartment had been neat and tidy. She stated that several items were missing from the apartment, including a small portable television set which had been next to Oringderff's bed, a foreign coin collection, a plastic water bottle filled with American coins, a men's ring bearing a horseshoe studded with diamonds and "all of Terry's guns."

Following extensive investigation by several law enforcement agencies, suspicion settled primarily upon appellant and his brother, Truman Moffett. Although law enforcement agents held several lineups in an effort to identify the gunman from among several possible suspects, none of the Rice employees present the morning of the robbery identified appellant as the gunman, either definitively or as a "possible," although appellant was apparently included in some of these lineups. Matthews and Billings did, however, indicate that Moffett was a "possible" suspect.

Appellant's defensive theory was that Oringderff himself had been a co-conspirator, along with unknown others, in the robbery of January 16. During cross-examination, Mary Oringderff stated that, following the robbery when Oringderff's whereabouts was still unknown, she was extremely concerned that something had happened to him. However, Mary testified that Cheryl Atkins did not appear to be nervous or concerned about Oringderff's safety at that time. Atkins was an assistant courtesy booth operator at the Rice store and she was shown to have been dating Oringderff intermittently since his separation from Mary. Based upon Atkins' demeanor at the store following the January 16 robbery, Mary had the feeling that Atkins knew more about the robbery than she was admitting publicly. Asked to explain the basis for her feeling, Mary stated Atkins' brother, Bobby Bartoo, had committed a robbery at the Rice store on January 3, and that at the time of the robbery, Oringderff had recognized Bartoo based on the sound of his voice. Mary further stated that Oringderff had told her that Bartoo committed the January 3 robbery "in case something happened to him [Oringderff]," and added that Oringderff was afraid of Bartoo. However, she also testified that Bartoo and Oringderff were good friends, and that if Bartoo had wanted to stage a robbery at the store, Oringderff would have gone along with him, based on that friendship.

Later on the morning of January 16, Mary and Atkins left the Rice store and went to Atkins' apartment. When she learned that Mary knew about Bartoo's involvement in the January 3 robbery, Atkins promised to get Mary some money in exchange for her silence. However, Atkins repeatedly assured Mary that neither she nor Bartoo had any involvement in the January 16 robbery.

On the evening of January 16, Atkins called Mary to inform her that the police had found Oringderff's body. At that point, Atkins was extremely upset, almost to the point of being hysterical. The following morning, Bartoo called Mary and said that he was sorry that this had happened to Oringderff. Bartoo sounded extremely upset, and cried at times during the conversation.

Appellant attempted to strengthen his defensive theory through the testimony of Cheryl Atkins, who testified for the defense. Atkins began dating Oringderff in the fall of 1983, around the time of his separation from Mary, and considered herself his girlfriend. Atkins had not been at the store on the morning of the January 3 robbery, and had quit her job at some unspecified point prior to January 16. When she asked Oringderff about the January 3 robbery, Oringderff told her that "he and Bobby had robbed the store." When Atkins first learned of the January 16 robbery, she thought that Bartoo and Oringderff had done it again, and was thus

unconcerned when Oringderff was missing following the January 16 robbery. However, she was extremely upset when Oringderff's body was found later in the day on January 16.

Shirley Jane Poteet, courtesy booth operator at the Rice store, testified that she picked Bobby Bartoo out of a police lineup as the robber from the January 3 robbery. Although she was unable to identify anyone as a "possible" suspect for the January 16 robbery at several subsequent lineups, Poteet was sure the January 16 robber was not the same person as the January 3 robber. Poteet explained that she noted particularly the build of the individual involved in the January 16 robbery, and that the January 16 robber was substantially larger or stronger than Bobby Bartoo.

Appellant's defensive theory was further developed through the cross-examination of Poteet. Oringderff had asked Poteet to come to work early on the morning of January 3, something he had never before asked of Poteet during the course of her employment. Poteet entered the front door of the store, a deviation from the usual custom of having employees enter the rear door, and Oringderff escorted her to the courtesy booth. The time delay lock had already been released and Oringderff and Poteet entered the courtesy booth. At some unspecified point, a single gunman entered the store and held a gun on Poteet and Oringderff as they emptied the currency from the safes into a bag. The gunman then escaped, leaving Poteet and Oringderff in a walk-in cooler at the rear of the store.

Poteet also stated that there had been shortages in the daily cash balances at the Rice store prior to January 3, and that the shortages had occasionally amounted to three hundred dollars per week. Following the January 3 robbery, the shortages were never over five to ten dollars per week, which was apparently accepted as "normal" at the Rice store. Poteet had the distinct impression that Oringderff had been trying to get Atkins, his girlfriend, into the courtesy booth for some time prior to the January 3 robbery. Finally, Poteet

noted that Oringderff's personality changed markedly after the January 3 robbery, and he became more irritable and more prone to "cause confusion" among the employees in the store after that date.

In response to the defensive theory put before the jury through the crossexamination of Mary and Poteet, the State called one Michael Lee Herr. Out of the presence of the jury, Herr testified that in late November, 1983, appellant told Herr that he had recently robbed a cash saver food warehouse, and then outlined a plan to rob the same store again in the near future. At the conclusion of the hearing on the admissibility of Herr's testimony, appellant objected as follows:

"... I believe that this testimony is testimony of an extraneous offense whose probative value is zero and naturally is outweighed by prejudice caused to the defendant, that there is extreme harm caused in testimony like this, that it in no way can show scheme or design or identity or any other exception to the general rule that extraneous offenses are not admissible against a defendant on trial because he's not to be tried for the collateral matters, he's to be tried for the offense that he's charged with and that this is going to create incredible harm in the minds of the jury and that there is absolutely no way to rectify that after he's testified."

When Herr's testimony was offered before the jury, appellant's counsel reiterated his objection as to the admission before the jury of appellant's extraneous offense in the November 27 robbery at the Rice store. Appellant's counsel also asked for, and was granted, a "continuous" or "running" objection, during Herr's testimony. All of appellant's objections were overruled.

Herr worked as a meter reader for Entex Gas Company. In that capacity, he became friends with appellant, who was also working as a meter reader for Entex, and with appellant's wife, Patty. During the fall of 1983, Herr and appellant both worked from a location on Hardy Road in far north Harris County. Herr testified that, in November, 1983, he had a conversation with

appellant in which appellant indicated that he was having financial problems and that he planned to rob a warehouse food store. Appellant stated to Herr that he had robbed the store once already, and that he was not satisfied with the amount of money he had gotten from the robbery.

Appellant outlined a plan to Herr in which he would hold the store manager at his apartment on a Sunday evening after the store manager's children and ex-wife had left from their weekend visit. Appellant was then going to take the manager to the store Monday morning and wait for the employees to arrive for work. As the employees arrived, they would be placed in the walk-in cooler. The store in question had a total of five safes, and appellant knew that he would have to wait until a time delay was deactivated before he could gain access to the room where the safes were located. Appellant intended to clean out all five safes, and assured Herr that the manager would not talk. During the course of this conversation, appellant had been doodling a diagram which he told Herr showed the locations of the five safes within the store.

Although he was having financial problems in late 1983 and early 1984, appellant left his position as a meter reader with Entex in December, 1983. However, Herr remembered specifically that appellant was scheduled to return to work on Monday, January 16, 1984. When appellant did not show up for work as scheduled, Herr first called appellant's house trailer, and then went by later in the day to see why appellant had not returned to work. Appellant was not at home, but appellant's wife was, and Herr recalled that he had never seen her as nervous as she was that day.

Herr further testified that he was acquainted with all three of appellant's brothers, particularly Truman Moffett. Although Moffett lived in Minnesota in the fall of 1983 and the spring of 1984, Herr recalled seeing him in appellant's presence or at appellant's house trailer at least half a dozen times in November and December of 1983.

On crossexamination, Herr stated that, following the January 16 robbery, he initially called Crimestoppers rather than law enforcement authorities because he was afraid of appellant. Herr called Crimestoppers again a few days after the initial call, to check on the progress of the case. Herr eventually talked with the police and sheriff's department after those agencies indicated a rather considerable need for his testimony in the case. Herr did eventually receive a one thousand dollar reward from Crimestoppers following appellant's arrest and indictment.

Out of the presence of the jury, the State called Byron Swindle, an assistant manager at the Rice store, to testify as to certain details of a November 27, 1983, robbery at that store. Following the proffer by the State, appellant objected that the testimony constituted an extraneous offense whose probative value was outweighed by its prejudicial impact, and that the testimony was irrelevant. The State countered that the defense had opened the door to this testimony by going into Oringderff's character and by insinuating that Oringderff had been a party to the January 16 robbery because he may have been a party to the January 3 robbery. The trial court held the testimony admissible.

Swindle, assistant manager at the Rice store, and Gilbert Mendoza, a stocker and sacker at the store, were the last individuals to leave that store on the evening of November 27, 1983. Just as he was locking the outer doors to the store, Swindle noticed a man wearing a stocking mask approaching him and Mendoza at rapid pace. The masked man produced a pistol and ordered Swindle to open the store. After informing the gunman that the silent alarm inside the store had already been activated, Swindle complied with the gunman's request and the trio entered the darkened store. They were joined shortly by a second gunman who was also wearing a stocking mask and carrying a pistol.

Swindle was ordered to hand over all the cash in the store, but explained to the gunmen that there were five safes in the store and that he had the combination to

only one of them. He also explained that four of the safes were in the courtesy booth, and that the outer door to the courtesy booth was equipped with a fifteen minute time delay lock. At some point during the transaction, one of the gunmen struck Swindle at the base of the neck with the butt of his gun and told him to "get the move on." The gunmen eventually took one thousand dollars from the safe located in the computer equipment room (referred to as the "manager's safe"),[3] and locked Swindle and Mendoza in a walk-in cooler.

During the course of the January 16 robbery, the masked gunman twice struck Swindle at the base of the neck with the butt of his gun and each time instructed Swindle to "get the move on." After being hit the first time, "it just sort of came to" Swindle that the January 16 robber was the same person as one of the two November 27 robbers. Based on the gunman's appearance, demeanor, voice, stance and general body build, in addition to the act of striking Swindle at the base of the neck and use of the phrase "get the move on," Swindle was sure that the January 16 robber was one of the two robbers from the November 27 robbery.

Larry Allen Deinema testified that he was a mechanical worker who had come to the Houston area from Illinois. Deinema met appellant in March or April of 1984, and worked for appellant for approximately six months. At one point in May or June of 1984, Deinema moved into the house trailer with appellant and appellant's wife Patty. According to Deinema, appellant talked about a "cash savers food store" on numerous occasions. Once when appellant and Deinema were driving around in north Houston, appellant pointed out the Rice Cash Savers store at 9419 North Freeway and stated "that's the store I robbed."

Over the course of their association, appellant told Deinema that appellant broke into "Terry's" apartment and waited for him to get home. On direct examination, Deinema indicated that appellant once used the complete name "Terry Oringderff." When Terry arrived at his apartment on Sunday evening, appellant was waiting inside for him, armed with a pistol. After a brief struggle, Terry was taken hostage. Appellant then took Terry to meet Moffett, at some undisclosed location, and Terry was wired with explosives connected to a model airplane control.

Deinema testified that appellant never went into specific details of the actual robbery on January 16th, other than to say that Terry was taken to the store wired with explosives, that money was obtained in the robbery and that Moffett was the one to actually enter the store during the robbery. Appellant did tell Deinema that Terry was killed because Terry could identify appellant's voice. Originally, Moffett was supposed to kill Terry, because appellant had "done everything else" connected with the robbery. However, following the robbery, Terry was taken to "a wooded area," and Moffett either could not or would not shoot him. Appellant told Deinema that he shot Terry once in the mouth, and then decided to empty the gun. Appellant described the gun used in the robbery and shooting as a 9 millimeter automatic pistol. Over objection that the testimony referred to an extraneous offense, Deinema testified that appellant obtained the pistol from the glove box of a pickup truck at the Chip Kicker Club located on FM 1960. Appellant also told Deinema that the pickup truck belonged to a lady police officer. Appellant's plan called for Moffett to dispose of the pistol after the robbery and shooting, and he was very upset when Mof-

---

**3.** Additional testimony indicated that, following the November 27, 1983, robbery, only the four safes in the courtesy booth were used, and that one of these four was also known as the "manager's safe." The store manager had the combination to the safe in the computer equipment room, and to the one safe in the courtesy booth known as the "manager's safe." The courtesy booth operator and her assistants had the com-

binations to the three additional safes in the courtesy booth. The "manager's safe" contained only the one thousand dollars that the store personnel used to make change in the evening after the courtesy booth operator had gone home, and the three remaining safes in the courtesy booth contained the proceeds from the store's sales until those funds could be taken to the bank.

fett was later arrested in Minnesota with the pistol still in his possession.

On crossexamination, appellant's counsel asked Deinema whether he had not told appellant's original trial counsel that Deinema had heard so many details regarding this offense from the police and other law enforcement agencies that Deinema was no longer able to distinguish what he actually remembered and what others had told him. Deinema maintained that he was testifying on the basis of his own personal memory, and not based upon what the police had told him. Defense counsel also elicited that Deinema and appellant frequently drank beer together while Deinema was living with appellant, although Deinema maintained that he lost consciousness due to his intoxication "a few" times at most during the several months that he was associated with appellant. Deinema also admitted smoking marijuana and using amphetamine or methamphetamine while living with appellant. Defense counsel further established that Deinema had no recollection where appellant and Deinema were at any of the various times that they discussed the robbery, what time of day it was, what day it was, what month it was, what Deinema and appellant were doing at the time, or how often appellant and Deinema discussed the robbery over the course of the summer of 1984.

On redirect examination, Deinema indicated that appellant repeatedly described the robbery of the "cash saver store," and that he and appellant often discussed things of a more or less personal nature during the summer when they were working at various construction jobs in divers locations in north Harris County. Deinema was told that appellant and Moffett split the proceeds from the robbery equally, and that Moffett was the one who actually entered the store during the January 16 robbery.

In support of Deinema's testimony as to the origin of the pistol used during the January 16 robbery, the State called H. Lee Grasham and Renita Lunsford to testify. Grasham, a Harris County Deputy Constable, testified that he purchased a Smith & Wesson Model 39 9 millimeter pistol in 1980, for use as his personal weapon, and that he last saw the pistol in the fall of 1983. Grasham stated that on November 17, 1983, the gun was in his Ford pickup at the time that he loaned the truck to his sister.

Renita Lunsford was Grasham's sister. On the evening of November 17, 1983, she borrowed her brother's pickup truck in order to go to the Chip Kicker Club on FM 1960 with Regina De La Paz. At the time she borrowed the truck, Lunsford was aware that her brother had left a pistol in the truck. Lunsford and De La Paz had gone to get some food, and were returning to the Chip Kicker when Lunsford was forced to stop quickly at an intersection. When she applied the brakes, Lunsford said that the gun slid out from under the driver's seat into plain view in the floor board of the truck. Lunsford instructed her friend to place the gun in the glove compartment of the truck, which was done, and the two women went into the club. Lunsford said that the last time she saw the pistol it was "in the hand of a white Caucasian" whom she did not know. Lunsford stated that the man with the gun had blonde hair.

Donna Sue Carlson, a customer service representative with Entex Gas Company, testified that she met appellant while he was a meter reader for Entex, and that they dated in the later part of 1983. At some point in late November, 1983, appellant told Carlson that he had robbed the "manager" of a "cash saver warehouse food store," and that he planned to do so again. Specifically, appellant confided in Carlson that he and Moffett had taken the manager at gunpoint just as the store was closing and forced him back into the store, where they had gotten one thousand dollars from one of the safes. Appellant obtained some information regarding the interior of the store and the security system from Carla Brewington and her boy friend, Terry Ruby. Ruby received $250 from the proceeds of the robbery on November 27 for this information. Appellant further indicated to Carlson that he and Moffett

were going to go back to the same store and stage a second robbery.

In further discussion, appellant indicated that he had staked the store out to get "the routine" down, and that he had followed Terry Oringderff "home" to his apartment. Appellant outlined two plans in his discussions with Carlson. In the first scenario, appellant and another would go into the store, clean out all five safes, and place all of the store's employees in the produce cooler. In the second, appellant was to go to the store with the manager and empty the safes while Moffett remained at Oringderff's apartment with his (Oringderff's) girlfriend as a hostage, in case something went wrong.

Appellant had also decided, according to Carlson, that the manager was to be killed after the robbery. Carlson asked why, and appellant said that perhaps the killing would not be necessary, but in the event that it was, the manager would be blindfolded.

On the day following the robbery and shooting, appellant called Carlson at work and told her that "he had some money for (Carlson)." When she asked him if he were responsible for "that," appellant declined to elaborate. Carlson indicated that, based on the context of the conversation, it was clear to both parties that "that" referred to the robbery at the Rice store. The record does not reveal whether Carlson ever received any of the money appellant referred to in this conversation.

On crossexamination, Carlson acknowledged that she initially lied to the police when she was questioned regarding the January 16 robbery and killing. Only after the police returned armed with more detailed information as to the offenses in question did Carlson disclose the details of her conversations with appellant.

Norm Swan of Benson, Minnesota, stated that appellant's brother, Moffett, lived with Swan's daughter Janet in Benson during the fall of 1983 and the spring of 1984. Following an extended trip to Texas in late 1983 and early 1984, Janet Swan and Moffet returned to Minnesota in late February, 1984. Among the souvenirs they brought back to Minnesota from their Texas sojourn was a "strange pistol," which Moffett usually kept "on the eating table in the dining room." Moffett also came into possession of a small portable color television set, a "little horseshoe ring," a canvas bank or mail bag approximately two-thirds full of loose change, and a collection of various "foreign coins" which Swan had never seen before. Although he had been unemployed prior to his departure from Minnesota in the fall of 1983, Moffett returned from Texas in February of 1984 in possession of sufficient funds to make a thirteen hundred dollar down payment on a home, a one thousand dollar down payment on a car and an unspecified down payment on a used truck. All of these transactions were in cash.

The small portable color television set in Moffett's possession when he returned from Texas was later shown to have the same serial number as the one missing from Oringderff's apartment. The "little horseshoe ring" in Janet Swan's possession was described by several witnesses as "identical" to the one missing from Oringderff's finger when his body was found. The pistol in Moffett's possession when he returned from Texas was later shown to have the same serial number as the pistol that had been stolen from Renita Lunsford at the Chip Kicker Club in Houston on November 17, 1983. Additional testimony showed that this pistol fired at least one of the 9 millimeter slugs found under Terry Oringderff's body on the morning of January 16, 1984.

Moffett was arrested in Benson, Minnesota, on June 10, 1984, and charged with the commission of the instant offense. Moffett's residence at 610 Church Street was searched, pursuant to a Minnesota warrant, and among the items discovered was a Smith & Wesson Model 39 9 millimeter semiautomatic pistol, several rounds of Remington Peters 9 millimeter ammunition, and several empty Remington Peters 9 millimeter shell casings. The pistol was admitted in evidence as State's exhibit number two, over appellant's relevancy objection.

Houston police officer C. E. Anderson, after having been qualified as a firearm's examiner, testified that all four of the empty Remington Peters 9 millimeter shell casings found near Oringderff's body were fired from State's exhibit number two, and could not have been fired from any other gun. Anderson also testified that one of the two 9 millimeter slugs found in the loose soil under Oringderff's body was fired from State's exhibit number two, and could not have been fired from any other weapon. As to the remaining 9 millimeter slug, Anderson stated that it definitely had been fired from a Smith & Wesson Model 39 9 millimeter semiautomatic pistol, but he could not say that it had been fired from State's exhibit number two to the exclusion of all other Smith & Wesson Model 39s.

Appellant attempted to counter the State's case, and fortify his own defensive theory that Oringderff had been a party to the January 16 robbery, by calling one Patrick Smith. Smith had been a friend of Oringderff's and had once been a co-manager, along with Oringderff, at the Rice store. At some point between September and Christmas of 1983, Oringderff called Smith and outlined a plan in which Smith and Oringderff would stage a robbery at the Rice store. Under Oringderff's proposed plan, Smith, suitably attired in a ski mask, was to be at the back door of the store as the employees arrived for work and was to force his way into the store at gunpoint. All the employees, except Oringderff and the courtesy booth operator, were to be confined in the produce cooler. Smith was to hold Oringderff and the courtesy booth operator at gunpoint while they emptied the safes in the courtesy booth, and then the courtesy booth operator was to be placed in the produce cooler. Oringderff and Smith were to leave in Oringderff's car, and Oringderff was to be left at some remote location. The robbery was to occur after a holiday weekend, as Oring-

derff estimated that there would be more money on hand on such an occasion.

At the conclusion of the initial conversation in which Oringderff outlined the plan, Smith declined to participate in the robbery. Smith continued to decline when Oringderff called back "a couple of times" over the next few months to see if Smith had changed his mind.

The State developed Oringderff's plan in greater detail on crossexamination. Oringderff's plan was "definitely a nonviolent thing," and it did not call for Oringderff to be held hostage the evening prior to the robbery, the ransacking of Oringderff's apartment, the theft of personal property from Oringderff's apartment, or the attachment of a package containing dynamite to Oringderff's neck during the robbery. Finally, there was no provision in the plan for Oringderff to be blindfolded and shot six times in the back and head.

When he first learned of the January 16 robbery, Smith felt that this was the "inside robbery" that Oringderff had earlier suggested to him. However, if he had been given all of the details of the January 16 robbery at one time, Smith said that he would not have thought this was the inside robbery that Oringderff had planned. Smith said that the January 3 robbery was much more consistent with Oringderff's plan than was the January 16 robbery.

■ In his second point of error, appellant complains that the trial court committed reversible error in admitting evidence showing that the alleged murder weapon was obtained during the commission of another robbery committed almost two months prior to the offense here in issue. Appellant vigorously argued to the trial court against the State's use of any extraneous offenses, specifically including what appellant describes as "the robbery at the Chip Kicker Club."[4] Following Ms. Luns-

---

**4.** The State argues on appeal, as it did in the trial court, that Lunsford's testimony was so directed by the attorneys for the State that it shows only an extraneous transaction, and not the commission of an actual offense. Appellant vigorously contends on appeal, as he did at trial, that the testimony clearly showed a robbery at

the Chip Kicker Club. We find that we need not resolve this conflict for, as the analysis set forth above will show, the testimony regarding the transaction at the Chip Kicker Club was admissible whether it is categorized as a robbery or a taking. With respect to the difference between extraneous transactions and those transactions

ford's testimony, defense counsel renewed his objection, arguing that the State had "gone in the back door" and established an extraneous offense at the Chip Kicker Club in the presence of the jury. Appellant contends that the obvious implication was that the blonde white male, whom Ms. Lunsford did not know, had taken the gun during a robbery, and that appellant was that blonde male.

Appellant submits that the testimony of Carlson and Deinema concerning appellant's conversations with them removed the issue of identity from the case. The testimony of Deinema alone, it is argued, constituted "an extra-judicial confession to the offense of capital murder for which appellant was being tried." Accordingly, Lunsford's testimony was "not necessary to prove identity, intent, scienter, malice or motive." In essence, appellant alleges that the State was using the testimony purely as propensity evidence, which this Court has often held is not permissible.

At the outset, we note that appellant placed his theory of the case before the jury during the crossexamination of Mary Oringderff and Poteet, and then developed that theory through the cross examination of various other state's witnesses, concluding with the direct testimony of Smith during presentation of appellant's evidence as to Oringderff's offer to participate in a robbery at his own store. The state responded to this theory with the testimony of Michael Lee Herr, followed later by that of Deinema, Grasham, Lunsford and finally Carlson.

 The accused is entitled to be tried on the accusation made in the state's pleading and he should not be tried for some collateral crime nor for being a criminal generally. Evidence showing the commission of an extraneous offense is usually excluded not because it is without legal relevance, but because such evidence is inherently prejudicial, tends to confuse the issues in the case, and forces the accused to defend himself against charges which he had not been notified would be brought against him. Before evidence of collateral crimes is admissible, a relationship between such evidence and the evidence necessary to prove that the accused committed the crime for which he stands charged must be shown. *Albrecht v. State,* 486 S.W.2d 97, 100 (Tex.Cr.App.1972). Probably the most common situation which gives rise to the admission of extraneous offenses is in rebuttal of a defensive theory. Whether or not the state may prove a collateral crime is to some extent dependent upon the burden of proof imposed on the state, and the type of evidence which the state has to offer in proof of the essential elements of its case in chief. *Id.* at 101. In some limited circumstances, evidence of extraneous offenses may become admissible where the effectiveness of the state's direct evidence, though uncontradicted by other evidence, is completely undermined by defense crossexamination. The mere fact that the state's witness was crossexamined will not, in and of itself, authorize the state to introduce evidence of extraneous offenses. Rather, it is the responses elicited from a state's witness on crossexamination which may allow the state to subsequently introduce extraneous offense evidence. *Id.* at 102.

It should be noted that appellant was never identified, either as a suspect or a "possible" suspect, by any of the witnesses to the robberies which occurred at the Rice store on January 16, January 3 and November 27, or as a suspect or "possible" suspect by any of the witnesses to the November 17 transaction at the Chip Kicker Club. Additionally, appellant put before the jury, both through vigorous crossexamination of the State's witnesses, and through the direct testimony of Smith, a plausible theory of the case; *viz.,* that the deceased had been a party, with person or persons other than appellant, to the robbery of January 3, and thus, by implication, a party to the robbery of January 16 as well. This evidence was summarized, and appellant's the-

constituting an offense, we adhere to the remarks of Judge Campbell in *Plante v. State,* 692

S.W.2d 487, 490 n. 3 (Tex.Cr.App.1985).

ory was reiterated for the members of the jury, during appellant's closing argument at the guilt-innocence phase of his trial. The State was thus called upon simultaneously to rebut appellant's theory of the case and to prove appellant's guilt of the offense alleged beyond a reasonable doubt.

In general, when an extraneous transaction committed by the accused constitutes a criminal offense, introduction of that extraneous offense is inherently prejudicial because the accused is entitled to be tried on the accusation made in the state's charging instrument, which specifies the material issues of the case, and not for some collateral crime of which he has no notice, and an accused's propensity to commit crimes is not an issue which is material to whether he is guilty of the specified conduct charged by the state. *Murphy v. State*, 587 S.W.2d 718, 721 (Tex.Cr.App.1979).

■■■ In discussing those situations in which such extraneous offense evidence does become admissible, this Court has occasionally shown a lamentable propensity to list those situations in which extraneous offenses have been admitted into evidence, frequently citing *Albrecht v. State*, supra, and then attempted to fit a given set of facts within one of the listed categories of circumstances. The better approach is certainly to eschew such mechanistic attempts to apply some *"Albrecht formula,"* and instead analyze the facts and circumstances of each case in light of the test set forth in *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Cr.App.1983),

"Extraneous transactions constituting offenses shown to have been committed

by the accused may become admissible upon a showing by the prosecution both that the transaction is *relevant* to a *material* issue in the case, and, the relevancy value of the evidence outweighs its inflammatory or prejudicial potential."

(emphasis in original, citations omitted) *Accord Murphy v. State*, 587 S.W.2d 718, 722 (Tex.Cr.App.1978); *Sanders v. State*, 604 S.W.2d 108, 111 (Tex.Cr.App.1980); *Morgan v. State*, 692 S.W.2d 877, 879 (Tex. Cr.App.1985); *Plante v. State*, 692 S.W.2d 487, 491 (Tex.Cr.App.1985); *Boutwell v. State*, 719 S.W.2d 164, 171 (Tex.Cr.App. 1985) (Opinion on Appellant's Petition for Review); *Cantrell v. State*, 731 S.W.2d 84, 90 (Tex.Cr.App.1987).[5]

■■■ This analysis is always to be conducted within the framework provided by the unique facts and circumstances of each particular case, and it does not lend itself to any readily quantifiable set of "weight factors" which militate for or against admissibility. The analysis is for the trial judge in the first instance and, absent a clear abuse of discretion, his decision will not be disturbed on appeal. *Templin v. State*, 711 S.W.2d 30, 33 (Tex.Cr.App.1986).

In the instant case, appellant's participation in the robbery and shooting of January 16 was a material issue. We are unable to accept appellant's contention that the testimony of Carlson and Deinema constituted sufficient evidence to withdraw the issue of identity from the case. This is particularly evident in light of the fact that appellant requested, and received, a jury instruction to the effect that Carlson was

**5.** Rule 403 of the Texas Rules of Criminal Evidence provides as follows:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

The plain language of Rule 403 shifts the focus somewhat from the test enunciated in *Williams*, supra, and its progeny. The approach under Rule 403 is to *admit relevant evidence* unless the probative value of that relevant evidence is *substantially* outweighed by the danger of unfair prejudice to a defendant.

Under either the analysis in *Williams*, supra, or Rule 403, the State was entitled to place before the jury evidence pertaining to the transaction at the Chip Kicker Club. The State's need for this evidence was particularly great in light of the paucity of alternative sources of proof that appellant had been a party to the January 16 robbery at the Rice store. Additionally, the State was entitled to rebut the theory placed before the jury through appellant's cross-examination of the State's witnesses, and through appellant's own witnesses; *viz.*, that Oringderff had been a party to both of the January robberies at the Rice store and that appellant had not been a party to either robbery.

an accomplice witness as a matter of law. She indicated that, during the period that she and appellant dated, they "discussed the [January 16 robbery] a lot." Accordingly, the jury was instructed that Carlson was an accomplice witness and that a conviction could not be had upon her uncorroborated testimony alone. Additionally, defense counsel elicited from Deinema admissions that, during the time Deinema was living and working with appellant, Deinema occasionally became intoxicated to the point of losing consciousness, was using either amphetamine or methamphetamine, was using marihuana, and was possibly using other controlled substances. Moreover, Deinema was unable to recall the precise time of day, the day of the week, the month, his physical location or other details surrounding his discussions with appellant regarding the January 16 robbery and shooting. Indeed, Deinema was able to relate only that he and appellant "talked a bunch of times about it," and that appellant once indicated toward the Rice store as they were driving past it and said that "that was the store he had robbed."

The State attempted to present to the jury a unified theory of the case which involved all of the various extraneous offenses discussed above. According to the State's theory, appellant, in need of funds, participated in the November 27 robbery at the Rice store and then, unhappy with the amount of money obtained as a result of that robbery, and supplied with additional information about the store gained from Swindle during that robbery, immediately formulated a plan by which to stage a second, more successful and obviously more lucrative robbery at the same Rice store as soon as possible.[6]

Once Deinema's credibility and veracity had been called into question through appellant's crossexamination, the State was entitled to present to the jury evidence that appellant had obtained the gun used in the January 16 robbery (and apparently the November 27 robbery as well) during the November 17 transaction at the Chip Kicker Club, just as appellant told Deinema during the conversations they had some four to six months later. The State's proof of the origin of the weapon during the transaction at the Chip Kicker Club on November 17, in connection with the State's expert witness' testimony that the 9 millimeter pistol stolen from Lunsford's pickup truck fired the bullets which killed Oringderff, serves to strengthen Deinema's testimony, and thus serves to show appellant's guilt in the capital murder of Terry Oringderff. The testimony of Lunsford and Grasham thus simultaneously places Deinema's testimony in context, by verifying certain portions of that testimony, and rebuts appellant's theory as to the events and circumstances of the January 16 robbery and killing.

It must be emphasized that the State presented evidence concerning the November 17 transaction involving Lunsford only after appellant had placed before the jury his own defensive theory, and after defense counsel had called Deinema's credibility into question. Through his cross examination of Mary Oringderff and Poteet, appellant's counsel elicited testimony both as to Oringderff's possible role in the January 3 robbery, and the fact that Oringderff underwent a marked personality change after that January 3 robbery. In conjunction with earlier testimony to the effect that Oringderff needed cash as a result of his recent divorce, and the further suggestion that Oringderff and his girl friend Atkins may have been involved in cash shortages at the Rice store, appellant's counsel placed before the jury a plausible theory that Oringderff had been involved with a person, or persons, other than appellant in the January 16 robbery. Indeed, Atkins testified that, when she first learned of the January

---

**6.** Swindle testified that he told both of the robbers during the November 27 robbery that there were five safes in the store and that he only had the combination to two of them, and that one of those two was within the courtesy booth. Swindle additionally told the robbers that the courte-

sy booth was equipped with a fifteen minute time delay device, and that opening the courtesy booth door after the store had been closed for the night would activate a silent alarm which would cause the store's security service to call the Houston Police Department.

16 robbery, she thought that her brother and Oringderff "had done it again."

■ The testimony of Carslon and Deinema was offered by the State to show that appellant had participated in the robbery and killing of January 16. However, as noted, the jury was instructed that Carlson was an accomplice witness as a matter of law, and that a conviction could not be had upon her uncorroborated testimony. Appellant's crossexamination of Deinema called Deinema's credibility into question by revealing a history of drug and alcohol use during the time in issue, and by suggesting that Deinema had made prior statements which indicated a lack of clear memory of those time periods. Once Deinema's testimony was called into question by means of appellant's crossexamination, the State was entitled to "shore up" that testimony with the testimony of Grasham and Lunsford, as their testimony supported Deinema's testimony in several material respects, thus making it more likely than not that he was telling the truth as to the remaining portions of his testimony. *Hammett v. State,* 713 S.W.2d 102, 106 n. 5 (Tex.Cr.App.1986); *Morgan v. State,* 692 S.W.2d 877, 882 n. 7 (Tex.Cr.App.1985).

■ Specifically, Grasham verified that he once owned a 9 millimeter semiautomatic pistol, and that he last saw the pistol in his pickup truck on November 17 when he loaned the truck to his sister. Lunsford's testimony supported Deinema's in that she stated the gun was taken from the pickup truck while that truck was parked at the Chip Kicker Club on FM 1960 on the evening of November 17, and in that the truck had a decal or sticker on the driver's side window which made it appear that Lunsford was a "lady police officer," as in Deinema's recitation of appellant's statements to him. Thus, the testimony from Carlson and Deinema went directly to show appellant's participation in the January 16 capital murder. The testimony from Lunsford and Grasham, regarding the November 17 transaction, was used to support the testimony of Deinema and Carlson, once the need for such support became obvious to the State. Under the unique facts of

this case, we hold that the testimony of Lunsford and Grasham was not an attempt to place the extraneous matter before the jury solely for its propensity value, but rather was an attempt to buttress the testimony of the State's witnesses Carlson and Deinema, who had already provided direct evidence of appellant's participation in that crime, once the need for such support became apparent. The State offered the testimony of Carlson and Deinema to establish appellant's participation in the January 16 robbery and killing. However, the testimony of Carlson and Deinema, standing alone, was not sufficient to require the exclusion of the extraneous transaction testimony from Lunsford and Grasham for three principal reasons.

First, it became apparent as the testimony developed that Carlson might be an accomplice witness, based on her role in the discussions with appellant regarding the planning of what would become the January 16 robbery. Accordingly, out of an abundance of caution, and in response to a request from appellant, the trial court submitted an instruction to the jury stating that Carlson was an accomplice witness as a matter of law, and that a conviction could not be had upon her uncorroborated testimony. Moreover, Deinema's credibility was called into question through appellant's crossexamination, as further discussed above. Finally, appellant's thorough crossexamination of the State's witnesses placed before the jury a plausible alternative theory of the case in which Oringderff, rather than appellant, was a participant in the robbery of January 16.

Thus, the State was left with a critical need to support the testimony of its two key witnesses, Carlson and Deinema. As we have observed elsewhere, "the greater the State's need to resort to extraneous offenses to prove up some material issue in the case, the higher will be the probative value of that offense in relation to its potential for prejudice." *Morgan v. State,* 692 S.W.2d 877, 880 n. 3 (Tex.Cr.App.1985). For the three reasons set forth above, the State needed to support or verify the testimony of Carlson and/or Deinema. This it

did with the testimony of Grasham and Lunsford, who substantiated several key factors in the Deinema's version of what appellant had told him regarding both the January 16 robbery and killing as well as some of the preceding extraneous transactions. Accordingly, the testimony of Grasham and Lunsford was relevant, as their testimony supported other testimony which directly established appellant's participation in the January 16 robbery and killing. Additionally, the probative value of the testimony of Grasham and Lunsford was clearly not substantially outweighed by the danger of unfair prejudice to appellant, in light of the severity of the State's need for their testimony, and the paucity of alternative sources with which to establish appellant's participation in the January 16 robbery and killing.[7]

The testimony of Lunsford and Grasham was properly admitted before the jury. Accordingly, appellant's second ground of error is overruled.

Appellant's third ground of error alleges that the trial court committed reversible error in admitting evidence of the November 27 robbery of the same Rice store. Much of what has been said as to the admissibility of the November 17 robbery of Lunsford applies to the admissibility of the November 27 robbery at the Rice store.

Prior to the admission of Herr's testimony, appellant's counsel objected, *inter alia,* that such testimony was "an extraneous offense that is not relevant," "irrelevant," "extremely damaging," "doesn't connect up at all," and constituted "an extraneous offense whose probative value is zero and naturally is outweighed by prejudice caused to the defendant." Appellant objected that any probative value Swindle's testimony might have was outweighed by the harm that testimony did to the appellant. Prior to Carlson's testimony, appellant objected that Carlson was an accomplice witness and was testifying to an ex-

traneous offense. All of these objections were overruled by the trial court, and appellant was granted a "running objection" as to the testimony of each of these three witnesses.

Herr testified as to his conversations with appellant in the later part of November, 1983, regarding appellant's having "robbed a warehouse food store" a few days earlier, and appellant's plans to "rob the same store" again in the near future. Swindle testified that based on physical size, demeanor, mannerisms, overall appearance and the use of the phrase "get the move on," in conjunction with striking Swindle at the base of the neck with the butt of his gun, Swindle was certain that the gunman at the January 16 robbery was one of the two gunmen from the November 27 robbery. Carlson testified in detail regarding her conversations with appellant in December and January during which appellant discussed the November 27 robbery as well as his plans to stage a second robbery at the same warehouse food store.

When appellant initially broached the possibility that Oringderff was a party to the January 3 robbery during appellant's cross examination of Mary Oringderff, the State asked to approach the bench and there informed appellant's counsel and the trial court that if appellant developed the subject of the January 3 robbery before the jury, the state would go into the November 27 robbery. Appellant now complains that all testimony relating to the November 27 robbery was irrelevant, and that any probative value in such testimony is outweighed by its prejudicial impact on appellant's case. We cannot agree.

The State's theory was that appellant and another person, probably Moffett, committed the robbery of Swindle at the Rice store on November 27. Unhappy that the proceeds of that robbery were substantially less than expected, and armed with the

---

7. As the Fifth Circuit has noted:
 "Probity in this context is not an absolute; its value must be determined with regard to the extent to which [the matter in issue] is established by other evidence, stipulation, or inference. It is the incremental probity of the evidence that is to be balanced against its potential for undue prejudice."
 *United States v. Beechum,* 582 F.2d 898, 914 (CA5 1978), *quoted in, Morgan v. State,* supra at 880 n. 4.

information about the store obtained during that robbery, appellant and Moffett immediately began planning a second robbery at the same store. The State contends that when appellant placed before the jury evidence as to the January 3 robbery, with the attendant theory that Oringderff had been a party to that robbery, and the implication that he also participated in the subsequent robbery on January 16, the State was entitled to rebut that theory through introduction of the November 27 robbery. Herr's testimony as to the November 27 robbery was one component of the presentation put forward by the State to rebut appellant's theory that the January 16 robbery had been an "inside job."

We examine the testimony of Herr, Swindle and Carlson, concerning the November 27 robbery at the Rice store, to ascertain if it is relevant to a material issue in the case, and if its probative value outweighs its inflammatory or prejudicial impact. *Williams v. State,* supra.

The substance of Carlson's testimony, and her status as an accomplice witness, have been discussed at length in our discussion of appellant's point of error two. We have little to add to what was said there, except to note that her testimony provided some direct evidence as to appellant's participation in the robbery and killing of January 16.

Swindle testified that, based on numerous similarities between the two men, he was certain that the masked gunman from the January 16 robbery was one of the two masked gunmen from the November 27 robbery. This testimony corroborated certain elements of the testimony Carlson would later give concerning appellant's familiarity with the location of the safes within the Rice store, the security system, the time delay lock on the courtesy booth door, and the fact that only Poteet could open all of the safes in the courtesy booth. Additionally, Swindle's testimony serves to rebut appellant's theory that the January 16 robbery was a sequel to the "inside job" of January 3 by showing that at least one of the two masked robbers from November

27 returned to the Rice store for an encore performance.

Herr's testimony also served a dual purpose for the State. In his conversations with Herr, appellant outlined a rather detailed scheme for a robbery at the Rice store at a point in time after the end of November 1983. The planned robbery appellant outlined to Herr involved waiting until the store manager's ex-wife had taken their children and left the manager's apartment at the end of a weekend visit; holding the manager captive at his apartment or another location; arriving at the Rice store in advance of the employees and placing them in the walk-in cooler as they arrived; waiting until all the time locks had released on the various safes in the store; and arranging things so that "the manager wouldn't talk."

Obviously, some of these items are common to similar robberies, but others are unique to this crime, and the sum of these items serves to make it very likely that appellant was indeed describing what would become the January 17 robbery to Herr. Additionally, Herr's testimony that appellant was to return for Entex on January 16, that he did not do so, and that appellant's wife was extremely nervous that particular day is also highly relevant. Not only is it inferential evidence of appellant's guilt, it also rebuts appellant's theory that Oringderff and not appellant was the mastermind of the January 16 robbery.

There was no abuse of discretion in admitting the testimony of Herr, Swindle and Carlson before the jury. Accordingly, appellant's third point of error is overruled.

In appellant's fourth point of error, he contends the trial court committed reversible error in not limiting the evidence of the November 27th robbery to the issue of identity for which it was admitted. In a related fifth point, appellant contends the trial court committed reversible error in not properly instructing the jury on the law of extraneous offenses.

In these two points, appellant argues that the trial court failed to properly instruct the jury that there was testimony of extraneous offenses in evidence; that ap-

pellant cannot be convicted of any offense shown by the evidence but not alleged in the indictment; and that extraneous offenses can only be considered for the particular purpose for which they were admitted.

The relevant portion of the trial court's charge to the jury is as follows:

"You are further instructed that if there is any evidence before you in this case regarding the defendant's committing an alleged offense other than the offense alleged against him in the indictment in this case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense, if any, and even then you may only consider the same in determining the scheme or design or identity or intent of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment and for no other purpose."

Appellant directs our attention to his written objection to the court's charge number 10. In pertinent part, that objection is as follows:

"The Defendant objects to the portion of the Court's Charge on extraneous offenses for failing to correctly and completely state the applicable law in the following particulars: it does not state:

a. for a fact that there is evidence of other offenses but leaves the issue to the jury to determine when in fact there is such evidence in the record;

b. that the Defendant is solely on trial for the offense alleged in the indictment and no other that may be shown by such evidence;

c. the particular purpose for which the evidence was admitted;

d. that the jury must find from the evidence beyond a reasonable doubt that such other offense was committed;

e. and that if committed, that this Defendant committed such other offenses."

▆ The testimony of Herr, Carlson, and Deinema, relating to the November 27 robbery of Swindle at the Rice store, had

been offered by the State "on the issues of scheme, design, identity or intent." We have held that the evidence was admissible to rebut appellant's defensive theory and to establish appellant's participation in the January 16 robbery. In essence, all of the extraneous transactions serve to shore up the State's evidence from Deinema and Carlson going to all of these factors. The extraneous offenses were properly admitted. The appellant was entitled, upon timely request therefor, to an instruction from the trial court limiting the jury's consideration of the extraneous offenses to the purpose or purposes for which they were admitted. *Crawford v. State*, 696 S.W.2d 903, 907 (Tex.Cr.App.1985); *Hitchcock v. State*, 612 S.W.2d 930 (Tex.Cr.App.1981); *King v. State*, 553 S.W.2d 105 (Tex.Cr.App. 1977), *Johnson v. State*, 509 S.W.2d 639 (Tex.Cr.App.1974). We have previously approved a limiting instruction essentially indistinguishable from that given in this case. *King v. State*, supra at 106–07. The court's charge in the instant case adequately restricted the jury's consideration of the extraneous offenses before them to the purposes for which that evidence was admitted. Appellant's fourth and fifth points of error are overruled.

After the State had rested, the defense called four witnesses, apparently either to undermine the credibility and veracity of the testimony they had already given for the State, or to further develop appellant's theory that Oringderff had been a party to the robbery of January 16. In rebuttal, the State called one Monte Hawpe. Hawpe stated that he and appellant were casual friends who frequently had coffee together in the morning at a restaurant in the vicinity of appellant's residence in north Harris county.

Over appellant's objection that the testimony constituted an extraneous offense which did not fall with any of the recognized exceptions to the rule barring admissibility of such evidence, Hawpe stated that a day or two after the robbery and shooting of January 16, appellant approached him in the restaurant and inquired as to whether Hawpe could sell some "hot" guns

for appellant. Hawpe asked if the guns were very hot and appellant responded in the affirmative. Hawpe asked if the guns were hot "from this area," and appellant again said yes. One of the guns was shown to be a .22 caliber Luger, which very closely resembled a pistol taken from Oringderff's apartment the evening of January 15 or the morning of January 16. The prosecutor implied during closing argument that appellant's possession of the gun within a few days of the killing strongly supported the inference that appellant acquired the gun at the time Oringderff was abducted from his apartment. No testimony was elicited that Hawpe ever agreed to sell any of the guns in question nor that he ever sold any of the guns in question.

In his sixth point of error, appellant contends the trial court committed reversible error in not instructing the jury that accomplice witness testimony to extraneous offenses must be corroborated. In his seventh point, appellant contends the trial court committed reversible error in refusing to instruct the jury that Monte Hawpe was an accomplice witness to an extraneous offense and must be corroborated. In his eighth point, appellant contends the trial court committed reversible error in not limiting the testimony of

Monte Hawpe to the specific purpose for which it was admitted. Appellant argues these points together, and we shall respond accordingly.

The portion of the trial court's jury charge relevant to accomplice witness testimony is set forth in the margin.[8] Appellant directs our attention to his requested charge number three. In pertinent part, that requested charge is as follows:

"A conviction cannot be had upon the testimony of an accomplice unless the jury first believe that the accomplice's evidence is true and that it shows the defendant is guilty of the offense charged against him, and even then you cannot convict unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission.

Even where a witness is an accomplice to an extraneous offense, his testimony must be corroborated just as if he were an accomplice to the offense charged in the indictment. If there is no such evidence, you cannot consider such evi-

---

**8.** The relevant portion of the trial court's jury charge was as follows:

"You are instructed an 'accomplice', as the term is hereinafter used, means anyone connected with the crime charged, as a party thereto, and includes all persons who are connected with the crime by unlawful act or omission on their part transpiring either before or during the time of the commission of the offense, and whether or not they were present and participated in the commission of the crime. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible or by both. Mere presence alone, however, will not constitute one a party to an offense.

You are instructed that Donna Sue Carlson was an accomplice, if any offense was committed as alleged in the indictment, and you cannot convict the defendant upon her testimony unless you first believe that her testimony is true and shows the guilt of the defendant as charged in the indictment, and then you cannot convict the defendant unless the accomplice's testimony is corroborated by

other evidence tending to connect the defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of an offense, but it must tend to connect the defendant with its commission.

Therefore, bearing in mind that Donna Sue Carlson was an accomplice, if any offense was committed, you are further instructed that you cannot find the defendant, Denton Alan Crank, guilty of the offense charged against him upon Donna Sue Carlson's testimony unless you first believe that said testimony is true and that it shows the defendant is guilty as charged in the indictment; and then you cannot convict the defendant unless you further believe that there is other evidence in the case outside of the evidence of Donna Sue Carlson tending to show, first, that the defendant, at the time he shot Terry Oringderff, if he did, was in the course of committing or attempting to commit the offense of robbery of Shirley Jane Poteet, and second, that he shot Terry Oringderff with specific intent to kill him, and even then, before you can convict the defendant you must believe from all the evidence, beyond a reasonable doubt, that the defendant is guilty."

dence. If there is such evidence, you can only consider it for the limited purpose for which it was admitted."

 Under the former Penal Code it was repeatedly held that an "accomplice witness" is a person who either as a principal, accomplice or accessory was connected with the crime by unlawful act or omission on his part, transpiring either before, at the time of, or after the commission of the offense, whether or not he was present and participated in the crime. *Gooch v. State,* 665 S.W.2d 112, 116 (Tex.Cr.App.1983); *Easter v. State,* 536 S.W.2d 223 (Tex.Cr. App.1976). The 1974 Penal Code abolished the distinction between a principal and an accomplice, and eliminated an accessory as a party to the crime, creating instead a separate and distinct offense of hindering apprehension or prosecution. *Gooch,* supra; § 38.05, V.T.C.A. Penal Code. A person who could be prosecuted as an accessory after the fact under the former Penal Code cannot be prosecuted as a party under the current Penal Code. *Gooch,* supra; *Easter,* supra.

 One is not an accomplice witness who cannot be prosecuted for the offense with which the accused is charged. *Gooch,* supra; *Easter,* supra; *May v. State,* 618 S.W.2d 333 (Tex.Cr.App.1981); *Russell v. State,* 598 S.W.2d 238 (Tex.Cr.App.1980). This is true despite the witness' complicity in other crimes committed by the accused. *Gooch,* supra; *May,* supra; *Easter,* supra.

 In appellant's case, there is no evidence in the record before us that Hawpe was an accomplice to the robbery of Poteet, nor to the killing of Terry Oringderff. Contrary to appellant's assertions in this Court, there is no evidence that Hawpe was "an accomplice to the extraneous offense of 'conspiracy or attempt to dispose of or receive stolen property.'" Assuming, arguendo, that Hawpe had been a party to some extraneous offense occurring after the capital crime here in issue, research reveals no cases in which this Court has held that the testimony of one who is an accomplice to an extraneous offense only must be corroborated when that person testifies regarding that extraneous offense.

We need not, and do not, address the issue now. Hawpe's testimony was correctly admitted during the state's rebuttal to show appellant's participation as a party to the robbery and killing of January 16. Appellant's points of error six, seven and eight are overruled.

In his ninth point of error, appellant contends the trial court committed reversible error in failing to instruct the jury that if Terry Oringderff was an equal owner of the property and that he consented to the taking of such property there would be no underlying theft and no capital murder.

Appellant's point of error is based on a written objection to the charge and a requested special instruction, both of which appellant submitted to the trial court. The written objection reads in pertinent part as follows:

"The court failed to instruct the jury that if the evidence shows that Terry Oringderff was a co-owner, or had equal ownership of the property with Shirley Poteet, and further find that he consented to the taking of the property, there would be no theft, no robbery, and there could be no capital murder and they must acquit for the offense of capital murder."

Appellant's requested special instruction to the jury runs in a similar vein. The argument is that appellant's "defensive issue" was raised by the evidence, and it was error not to give his requested instruction to the jury.

The indictment in appellant's case, omitting the formal parts, read as follows:

".... Denton Alan Crank.... did.... while in the course of committing and attempting to commit the robbery of SHIRLEY POTEET, intentionally cause the death of TERRY ORINGDERFF.... by shooting the Complainant with a gun."

The language in the indictment was sufficient to allege capital murder. *Morin v. State,* 682 S.W.2d 265 (Tex.Cr.App.1983); *Lamb v. State,* 680 S.W.2d 11 (Tex.Cr.App. 1984). The State alleged the killing of Oringderff during the robbery or attempted

robbery of Poteet, as the State was entitled to do.

We note that the State alleged the robbery of Poteet, not Oringderff, and that Poteet testified that on January 16, 1984, the money in the courtesy booth was in her control, she did not give anyone permission to take it, and she was in fear of imminent bodily injury or death during the entire course of the robbery. A taking without the owner's effective consent never becomes a disputed fact issue when it is alleged, proven and found that the owner was threatened or placed in fear of imminent bodily injury or death intentionally or knowingly by an accused in the course of the taking. *Hill v. State*, 640 S.W.2d 879, 886 (Tex.Cr.App.1982) (Clinton, J., dissenting), overruled, *Woods v. State*, 653 S.W.2d 1 (Tex.Cr.App.1982). The State having alleged and proven all that was necessary as to the taking from Poteet, the issue of Oringderff's consent simply does not arise.

Assuming, arguendo, that Oringderff was a party to the January 16 robbery, and that he thus gave his consent to the taking, appellant's argument would still be without merit. The State alleged a robbery or attempted robbery of Poteet.[9] Under the current Penal Code, actual commission of theft is not a prerequisite to the commission of robbery; the gravamen of robbery is the assaultive conduct and not the theft. *Autry v. State*, 626 S.W.2d 758 (Tex.Cr.App.1982); *Evans v. State*, 606 S.W.2d 880 (Tex.Cr.App.1980). Even if Oringderff had been a party to the robbery, and even if he had consented to the taking of the money from the safes in the courtesy booth of the Rice store, it is elementary that he could not consent to the assaultive conduct directed against Poteet. The uncontroverted evidence presented at appellant's trial clearly shows that Poteet was the victim of a robbery, as the State had alleged in the indictment.

Since the issue of Oringderff's consent was immaterial to the commission of the robbery of Poteet alleged in the indictment, appellant's requested instruction was an erroneous statement of the law. The trial court was correct in refusing to include appellant's requested instruction in the jury charge. Appellant's ninth point of error is overruled.

In his tenth point of error, appellant contends the trial court committed reversible error in not affirmatively instructing the jury that if the immediate flight had ended when the killing occurred there would be no capital murder.

Oringderff's body was found on a deserted road approximately 12.6 miles from the Rice store, and that the trip from the store to that location would have taken approximately seventeen minutes at normal highway speeds. Oringderff was last seen alive at the Rice store at approximately 8:10 on the morning of January 16, and at approximately 8:30 that morning, six or seven shots were heard from the location where his body was later discovered.

The court's charge instructed the jury if they concluded appellant killed Oringderff but had a reasonable doubt as to whether appellant was in the commission of the robbery of Poteet or in immediate flight after the attempt or commission of the robbery of Poteet, then the jury was to find appellant guilty of murder but not capital murder. The relevant definitions were provided within the charge. Moreover, the portion of the court's charge defining capital murder required the jury to find that appellant shot Oringderff during the commission or attempted commission of the robbery. The charge on the lesser included offense of murder instructed the jury that if they did not find that appellant was engaged in the commission of a robbery or in the immediate flight therefrom at the time of the shooting, they could only find appellant guilty of murder and not capital

9. Although legal ownership of the money involved was vested in some corporate entity, the State was entitled to prove that Poteet was the nonconsenting owner; the facts show that she had possession of money in the courtesy booth and, as a majority of the Court would say, she had a greater right to possession than did appellant. V.T.C.A. Penal Code, § 1.07(24) and (28); *Compton v. State*, 607 S.W.2d 246, 249–51 (Tex. Cr.App.1980) (Opinion on State's Motion for Rehearing).

murder. Reading the court's charge as a whole, it is clear that if the jury believed the immediate flight had ended at the time of the shooting, the jury would be precluded from finding appellant guilty of capital murder. The charge given adequately covered the requested instruction. Accordingly, no harm is shown. *Philen v. State*, 683 S.W.2d 440 (Tex.Cr.App.1984); *Davis v. State*, 651 S.W.2d 787 (Tex.Cr.App.1983); *Viduarri v. State*, 626 S.W.2d 749 (Tex.Cr.App.1981). Appellant's tenth point of error is overruled.

In his eleventh point of error, appellant contends the trial court committed reversible error in denying a portion of his motion to quash the indictment for failure to allege that appellant was criminally responsible for the conduct of another and was acting as a party. In a related twelfth point of error, appellant contends the trial court committed reversible error in overruling appellant's objection to the instruction to the jury on the law of parties and criminal responsibility.

In pertinent part, appellant's motion to quash the indictment reads as follows:

"The present indictment purports to charge the offense of capital murder, in two separate counts. However, presently pending in this Court is another indictment charging this Defendant with conspiracy to commit aggravated robbery, in Cause No. 410,345. In that indictment, names[sic] Truman Moffett as the coconspirator in each offense. The records of this Court also reflect that Truman Olen Moffett, Jr., is charged in Cause No. 406,644 with the conspiracy offenses.

*If* [sic] it is the State's position that these two individuals did in fact act together, this Defendant is entitled to an allegation that he acted as a party to the offense, and if guilty at all, is guilty under the theory of criminal responsibility as set forth in Secs. 7.01 and 7.02, V.T.C.A., Penal Code. Such an indictment should allege:

1. facts showing the Defendant's culpability (if any) and the culpability of others in the commission of the offense;

2. facts which would tend to show each of the coconspirators were acting together and criminally responsible for the conduct of others, if that is in fact what the State intends to prove at trial. In the absence of such allegations, the Defendant must assume that the State will attempt to prove that he alone committed the acts alleged in the indictment and that he is not responsible for the acts of others."

Appellant's motion to quash the indictment was denied by the trial court. Appellant also filed written objections to the trial court's charge alleging that inclusion of a parties theory in the court's charge when none had been in the indictment constituted an impermissible amendment of the indictment. Appellant further challenged § 7.01, V.T.C.A. Penal Code, as being in violation of the due process clause of the United States Constitution and Article I, § 10 of the Texas Constitution. The trial court never responded to appellant's written objections to the charge.

A party to an offense may be charged with the offense without alleging the facts which make the defendant a party to the offense and criminally responsible for the conduct of another. V.T.C.A. Penal Code, § 7.02; *Rico v. State*, 707 S.W.2d 549 (Tex.Cr.App.1986); *Pitts v. State*, 569 S.W.2d 898 (Tex.Cr.App.1978). This Court has held that the law of parties announced in Sections 7.01 and 7.02 of the Penal Code is applicable to capital murder cases. *English v. State*, 592 S.W.2d 949 (Tex.Cr.App.1980); *Wilder v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979); *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App.1976).

The trial court correctly overruled appellant's motion to quash the indictment. Appellant's eleventh point of error is overruled.

The record reflects that the trial court gave a correct, general charge on the law of parties at the guilt-innocence phase of appellant's trial, and then applied the law to the facts of appellant's case.

In his twelfth point of error, appellant contends the trial court committed reversible error in overruling his objection to the

court's instruction to the jury on the law of parties. Appellant contends that to the extent V.T.C.A. Penal Code, § 7.01(c) allows a conviction under the law of parties, or criminal responsibility for the acts of another, that section allows a conviction under facts not alleged in the indictment, in violation of the due process clause of the Fourteenth Amendment of the United States Constitution and Article I, §§ 10, 19 and 29 of the Texas Constitution.

■ We have previously rejected the argument appellant now advances in another capital murder prosecution. *Demouchette v. State*, 731 S.W.2d 75 (Tex.Cr.App. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). If the evidence supports a charge on the law of parties, the court may charge on the law of parties even though there is no such allegation in the indictment or information. *Rico*, supra; *English*, supra; *Galvan v. State*, 598 S.W.2d 624 (Tex.Cr.App.1979); *LeDuc v. State*, 593 S.W.2d 678 (Tex.Cr. App.1979); *Pitts*, supra. Appellant's twelfth point of error is overruled.

In his thirteenth point of error, appellant contends the trial court committed reversible error in overruling a portion of appellant's motion to quash the indictment which complained of the failure to define words in that indictment going to the conduct of the appellant.

■ In pertinent part, appellant's pretrial motion to quash the indictment reads as follows:

"The indictment fails to give sufficient notice of what the Defendant must be prepared to meet in that it fails to allege:

a) which of the definitions of the phrase 'in the course of committing and attempting to commit robbery', provided by Sec. 29.01 (1), and Sec. 31.03, supra, the State intends to prove at trial:

b) which of the means of 'unlawfully', as defined by Sec. 1.07(a)(36), supra, by which the State intends to prove the conduct was committed;

c) which of the definitions of 'intentionally', as defined by Sec. 6.03(a), supra, by which the State intends to prove the conduct was committed[;]

d) the particular type of 'firearm', as defined by Sec. 46.01(3), supra, with which the State intends to prove was used in the shooting.[; and]

e) that the Defendant voluntarily engaged in the conduct set forth in the indictment.

The indictment fails to meet the requirements of Articles 21.02 (7), 21.03 and 21.11, V.A.C.C.P."

Appellant's motion to quash the indictment was overruled by the trial court.

■ Appellant's complaint regarding the allegation of "in the course of committing and attempting to commit robbery" has been expressly rejected by the Court. *Lamb v. State*, 680 S.W.2d 11 (Tex.Cr.App. 1984). With regard to the allegation of "unlawfully," we have held that this is not an act or omission on the part of the accused which requires a specific allegation of manner and means. *Ferguson v. State*, 622 S.W.2d 846 (Tex.Cr.App.1981). An allegation of "unlawfully" in the indictment is not an element of the crime alleged. Rather it is redundant surplusage. *Ex parte Reed*, 610 S.W.2d 495 (Tex.Cr.App.1981). A single definition of "intentional" is provided by statute in V.T.C.A. Penal Code, § 6.03(a). When a term is defined statutorily, it need not be further alleged in the indictment. *American Plant Food v. State*, 508 S.W.2d 598 (Tex.Cr.App.1974); *May v. State*, 618 S.W.2d 333 (Tex.Cr.App. 1981).[10] The use of the word "firearm" in an indictment is sufficient as against a request for additional specificity. *O'Briant v. State*, 556 S.W.2d 333 (Tex.Cr.App. 1977). Finally, the voluntariness of appellant's actions is not an element of capital murder which must be pled in the indictment; rather, it is an affirmative defense which must be raised by the accused. V.T. C.A. Penal Code, § 8.05.

---

**10.** When the trial court comes to define the term in its charge to the jury, however, it should select that part of the definition that fits the offense alleged. See *Alvarado v. State*, 704 S.W. 2d 36 (Tex.Cr.App.1985).

The trial court correctly overruled appellant's motion to quash the indictment. Appellant's thirteenth point of error is overruled.

We have reviewed each of appellant's points of error and we find them all without merit. Accordingly, we affirm appellant's conviction and sentence of death.

ONION, P.J., concurs in the result.

TEAGUE, J., dissents.