ACCEPTED
06-14-00147-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
3/19/2015 2:18:58 PM
DEBBIE AUTREY
CLERK

**ORAL ARGUMENT WAIVED**

CAUSE NO. 06-14-00147-CR

IN THE

COURT OF APPEALS

SIXTH APPELLATE DISTRICT OF TEXAS AT TEXARKANA

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS

3/19/2015 2:18:58 PM

DEBBIE AUTREY
Clerk

_____

AZIM SHAKUR RAHIM, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

ON APPEAL FROM THE COUNTY COURT AT LAW
LAMAR COUNTY, TEXAS
TRIAL COURT NO. 61685; HONORABLE BILL HARRIS, JUDGE

_____

# APPELLEE'S (STATE'S) BRIEF

_____

Gary D. Young, County and District Attorney
Lamar County and District Attorney's Office
Lamar County Courthouse
119 North Main
Paris, Texas   75460
(903) 737-2470
(903) 737-2455 (fax)

**ATTORNEYS FOR THE STATE OF TEXAS**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Tex. R. App. P. 38.2(a)(1)(A), the list of parties and counsel is not required to supplement or correct the appellant's list.

# TABLE OF CONTENTS

**PAGE NO.:**

IDENTITY OF PARTIES AND COUNSEL . . . . . . . . . . . .     i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . .     ii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . .     iv

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . .     vii

STATEMENT REGARDING ORAL ARGUMENT. . . . . .     viii

ISSUE PRESENTED IN REPLY. . . . . . . . . . . . . . . . . . . .     ix

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . .     2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . .     15

ARGUMENT AND AUTHORITIES

        **ISSUE PRESENTED IN REPLY NO. 1:  JURY CHARGE ERROR DID NOT EXIST; OR IN THE ALTERNATIVE, THE APPELLANT, RAHIM, COULD NOT PROVE EGREGIOUS HARM.** . . . . . . . . . .     16

        **ISSUE PRESENTED IN REPLY NO. 2:  THIS COURT SHOULD ORDER THE SUPPLEMENTATION OF THE CLERK'S RECORD TO INCLUDE A CERTIFIED BILL OF COSTS.** . . . . . . . . . . . . . . .     21

PRAYER  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     25

**PAGE NO.:**

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . .                   26

CERTIFICATE OF SERVICE   . . . . . . . . . . . . . . . . . . . . .                   26

# INDEX OF AUTHORITIES

**CASES:**                                                               **PAGE:**

*Albrecht v. State*, 486 S.W.2d 97, 101 (Tex. Crim.
App. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim.
App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Armstrong v. State*, 340 S.W.3d 759, 766-67 (Tex. Crim.
App. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

*Armstrong v. State*, 850 S.W.2d 230, 236 (Tex. App.--
Texarkana 1993), *aff'd*, 897 S.W.2d 361 (Tex.
Crim. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18,19

*Ballinger v. State*, 405 S.W.3d 346,348, 349 (Tex. App.--Tyler
2013, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22,24

*Bluitt v. State*, 137 S.W.3d 51, 53 (Tex. Crim.
App. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Crank v. State*, 761 S.W.2d 328, 341 (Tex. Crim.
App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Graves v. State*, 176 S.W.3d 422, 433 (Tex. App.--Houston
[1st Dist.] 2004, pet. dism'd) . . . . . . . . . . . . . . . . . . . . 20

*Halliburton v. State*, 528 S.W.2d 216, 219 (Tex.
Crim. App. 1975) (op. on reh'g) . . . . . . . . . . . . . . . . 17

*Hutch v. State*, 922 S.W.2d 166, 172 (Tex. Crim.
App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Johnson v. State*, 423 S.W.3d 385, 392 (Tex. Crim. App.
2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Johnson v. State*, 963 S.W.2d 140, 144 (Tex. App.-- Texarkana 1998, pet. ref'd) . . . . . . . . . . . . . . . . . . . .    17-18,19

*Jones v. State*, 241 S.W.3d 666, 669 (Tex. App.--Texarkana 2007, no pet.) (Lamar County) . . . . . . . . . . . . . . . . .    17,19

*Mayer v. State*, 309 S.W.3d 552, 557 (Tex. Crim. App. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

*Randyael Dontrell Tyson v. The State of Texas*, No. 06-14-00114-CR, 2015 Tex. App. LEXIS 2506, at * 13-15 (Tex. App.--Texarkana March 18, 2015, n.p.h.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23,24

*Robinson v. State*, 844 S.W.2d 925, 929 (Tex. App.-- Houston [1st Dist.] 1992, no pet.) . . . . . . . . . . . . . . .    17,19

*Shipp v. State*, 331 S.W.3d 433, 443 (Tex. Crim. App. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17,19

*Tate v. State*, 981 S.W.2d 189, 193 n. 5 (Tex. Crim. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

*Taylor v. State*, 332 S.W.3d 483, 489, 490 (Tex. Crim. App. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19,20,21

*Whatley v. State*, No. 06-12-00117-CR, 2014 WL 7399130, at * 1, 2014 Tex. App. LEXIS 13839, at * 2, *3 (Tex. App.--Texarkana December 30, 2014, no pet.) (mem. op., not designated for publication) . . . . . . . . . . . . .    22,24

**STATUTES:** **PAGE:**

TEX. CODE CRIM. PROC. ANN. ART. 103.006
(WEST 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

TEX. CODE CRIM. PROC. ANN. ART. 103.001
(West 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

TEX R. APP. P. 34.5(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . 23,24

TEX. R. APP. P. 38.2 . . . . . . . . . . . . . . . . . . . . . . . . . . viii

TEX. R. APP. P. 38.2(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . i

TEX. R. EVID. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATEMENT OF THE CASE

This is a criminal appeal from the trial court's final judgment of conviction. *See* CR, pgs. 62-64.

After a jury trial, a jury in Lamar County found the appellant, Rahim, guilty of the misdemeanor offense of assault causing bodily injury (RR, Vol. 3, pg. 272; CR, pg. 57), as charged in the information. *See* CR, pg. 5. The jury assessed punishment at confinement for 365 days in the Lamar County jail and assessed a fine of none. *See* RR, Vol. 3, pg. 296; CR, pg. 61.

After pronouncing sentence (RR, Vol. 3, pgs. 298-299), the trial court signed its final judgment of conviction. *See* CR, pgs. 62-64. Rahim timely filed his notice of appeal. *See* CR, pg. 65. By this appeal, Rahim raised two (2) issues/points of error.

## STATEMENT REGARDING ORAL ARGUMENT

The State will waive oral argument.  *See* Tex. R. App. P. 38.2.

## ISSUES PRESENTED IN REPLY

**ISSUE PRESENTED IN REPLY NO. 1:** JURY CHARGE ERROR DID NOT EXIST; OR IN THE ALTERNATIVE, THE APPELLANT, RAHIM, COULD NOT PROVE EGREGIOUS HARM.

**ISSUE PRESENTED IN REPLY NO. 2:** THIS COURT SHOULD ORDER THE SUPPLEMENTATION OF THE CLERK'S RECORD TO INCLUDE A CERTIFIED BILL OF COSTS.

CAUSE NO. 06-14-00147-CR

IN THE

COURT OF APPEALS

SIXTH APPELLATE DISTRICT OF TEXAS AT TEXARKANA
_____

AZIM SHAKUR RAHIM, Appellant

V.

THE STATE OF TEXAS, Appellee
_____

ON APPEAL FROM THE COUNTY COURT AT LAW
LAMAR COUNTY, TEXAS
TRIAL COURT NO. 61685; HONORABLE BILL HARRIS, JUDGE
_____

# APPELLEE'S (STATE'S) BRIEF
_____

TO THE HONORABLE SIXTH COURT OF APPEALS AT
TEXARKANA:

COMES NOW, the State of Texas, by and through the elected County
and District Attorney of Lamar County, Gary D. Young, and the Lamar
County and District Attorney's Office, respectfully submits its Appellee's
(State's) Brief under Rule 38.2 of the Texas Rules of Appellate Procedure.

Unless otherwise indicated, Azim Shakur Rahim will be referred to as

-1-

"the appellant" or "Rahim" and the State of Texas as "the State."

## STATEMENT OF FACTS

### Factual Background.

On November 20, 2013 (RR, Vol. 3, pgs. 30, 58, 157, 174, 177), Robert Milton, a licensed peace officer for twenty-three years and six months and a patrol officer with the City of Paris Police Department, (Officer Milton) responded to an incident a *Quick Stop* or a *Speedy Stop* at 2205 Clarksville in Lamar County, Texas. *See* RR, Vol. 3, pgs. 28-30, 60, 70-74, 157. *See also* State's Exhibits 9-16. It was daylight; Officer Milton was on the day shift. *See* RR, Vol. 3, pg. 30.

On November 20th, Tapfuma Omega Thomas (Thomas) was the cook (RR, Vol. 3, pg. 92) at the *Speedy Stop* and was cooking burgers at the time. *See* RR, Vol. 3, pgs. 110-111. According to Thomas, he was taking an order for a hamburger that day from Larry Solomon (Mr. Solomon). *See* RR, Vol. 3, pgs. 113, 115. Mr. Solomon, who called the cook "Tot" (RR, Vol. 3, pg. 179), was placing his order, and Rahim came around to the counter. *See* RR, Vol. 3, pg. 115. Mr. Solomon heard somebody say, "hey, Brother Larry." *See* RR, Vol. 3, pg. 179. *See also* RR, Vol. 3, pg. 194. Mr. Soloman turned around and it was Rahim, who said, "let me talk to you for a minute." *See*

RR, Vol. 3, pg. 179.  *See also* RR, Vol. 4, pg. 194-197.

Rahim told Mr. Solomon, "could you please talk to me out here, we need to have a conversation."  *See* RR, Vol. 3, pg. 115.  Rahim was "[t]alking calm, no raised voices, cuss word"s, nothing."  *See* RR, Vol. 3, pg. 115.  "They went ahead and went outside."  *See* RR, Vol. 3, pg. 116.

About that time, Devin Washington (Washington) pulled up to the gas station to get something to eat, when he saw Rahim and Mr. Solomon come out of the store.  *See* RR, Vol. 3, pgs. 136-138.  Washington saw them talking "normally."  *See* RR, Vol. 3, pg. 139.  Bobby Woyn Harrison (Harrison) was also going into the store.  *See* RR, Vol. 3, pg. 170.  As Harrison entered the store, a conversation was going on.  *See* RR, Vol. 3, pg. 170.  That's when Harrison saw them exit the store.  *See* RR, Vol. 3, pg. 170.

Right before Washington got out, he saw Rahim throw a punch.  *See* RR, Vol. 3, pgs. 137-139.  According to Washington, "[i]t was more like caught him off guard, like a jab to his face."  *See* RR, Vol. 3, pg. 139.  According to Mr. Solomon said, "[h]e sucker punched me out of nowhere."  *See* RR, Vol. 3, pg. 180; State's Exhibit 8.

After that, Washington didn't see more because a car had blocked his

view. *See* RR, Vol. 3, pgs. 140-141, 145. Washington opened his door to go to investigate and see what was going on. *See* RR, Vol. 3, pg. 141. "I seen them both on the ground." *See* RR, Vol. 3, pg. 141. Washington heard the word, "gun" but he didn't see it. *See* RR, Vol. 3, pg. 141. "They said it fell out." *See* RR, Vol. 3, pg. 141. "A good five or six people" were around. *See* RR, Vol. 3, pg. 142.

It wasn't two minutes later when another patron came in the store and said to Thomas, "they're fighting, they're fighting, go help." *See* RR, Vol. 3, pg. 116. Thomas came out that front door of the store. *See* RR, Vol. 3, pgs. 117, 185. They were already on the ground. *See* RR, Vol. 3, pg. 117.

Washington saw Thomas come out, and "[h]e was trying to break up the fight." *See* RR, Vol. 3, pg. 142. *See also* RR, Vol. 3, pgs. 164, 171, 183. They were on the ground for "a few good minutes." *See* RR, Vol. 3, pg. 142. *See also* RR, Vol. 3, pg. 166.

Mr. Solomon said, "Tot, just get the gun, I ain't going to shoot nobody." *See* RR, Vol. 3, pg. 185. That's when Tot come over and took the gun out of Mr. Solomon's hand. *See* RR, Vol. 3, pg. 185.

Rahim had his knee in his back and was still punching him in the back of the head. *See* RR, Vol. 3, pgs. 117, 121, 124. Rahim had one hand on the

pistol and Mr. Solomon had both hands on it.  *See* RR, Vol. 3, pgs. 117, 134, 163.  They were both fighting over the gun.  *See* RR, Vol. 3, pgs. 184-185.

After they were separated, Washington didn't see Thomas with the weapon, and he didn't witness who took the weapon away.  *See* RR, Vol. 3, pgs. 153-154.

Thomas could see that Mr. Solomon was bleeding.  *See* RR, Vol. 3, pg. 118.  Thomas grabbed Rahim, and was asking him to let him go.  *See* RR, Vol. 3, pg. 118.  *See also* RR, Vol. 3, pg. 187.  Thomas got him off of Mr. Solomon.  *See* RR, Vol. 3, pg. 187.  Thomas made sure the police were called.  *See* RR, Vol. 3, pg. 122.

Both relinquished the pistol to Thomas, who passed it to another witness, Harrison.  *See* RR, Vol. 3, pgs. 119, 121, 128, 155, 164-165.  Harrison had the gun, when the police came.  *See* RR, Vol. 3, pg. 164.

**Arrival of Law Enforcement.**

Dispatch advised there was disturbance at the *Speedy Stop* involving a gun.  *See* RR, Vol. 3, pgs. 31, 40, 58.  Officer Milton answered the call, along with Officer Bigler and Sergeant Brandenburg, who was the first officer on the scene.  *See* RR, Vol. 3, pg. 31.

Sergeant Thomas Brandenburg, a certified peace officer and field

supervisor, (Sergeant Brandenburg) had primarily supervisory duties for the past five years in the Paris Police Department. *See* RR, Vol. 3, pgs. 55-56. Sergeant Brandenburg was the direct supervisor of Officer Milton. *See* RR, Vol. 3, pg. 79.

Sergeant Brandenburg secured the gun from a gentleman named Harrison. *See* RR, Vol. 3, pg. 59. After securing the gun, Sergeant Brandenburg initially made contact with Rahim, who was "somewhat aggressive" and shouting at the victim, Larry Solomon (Mr. Solomon). *See* RR, Vol. 3, pg. 60. Sergeant Brandenburg tried to separate the parties that were involved, and he took Rahim to Mr. Bigler's patrol car. *See* RR, Vol. 3, pgs. 60-61, 67. Rahim was still "very agitated." *See* RR, Vol. 3, pg. 68. *See also* RR, Vol. 3, pg. 75.

In the patrol car, Rahim told Sergeant Brandenburg that "he had indeed struck first but he claimed that Mr. Solomon had came at him in what he describe[d] as an aggressive manner." *See* RR, Vol. 3, pg. 62. *See also* RR, Vol. 3, pg. 93. Rahim claimed the gun was never pointed at him. *See* RR, Vol. 3, pgs. 62, 65. The gun wasn't pulled while they were standing up. *See* RR, Vol. 3, pg. 65. The gun got pulled out when they were on the ground. *See* RR, Vol. 3, pgs. 65-66.

When Officer Milton arrived, there was several people standing around, and Sergeant Brandenburg was talking to a gentlemen that was later identified as Asim Rahim. *See* RR, Vol. 3, pg. 31. Officer Milton recognized Mr. Bobby Harrison, "Paulia" Harrison and Thomas. *See* RR, Vol. 3, pgs. 31-32, 158. Officer Milton spoke with Mr. Solomon, the victim, to get his side of the story of what happened. *See* RR, Vol. 3, pgs. 32, 36. Mr. Solomon was "about 5' 8" (RR, Vol. 3, pgs. 68, 120) or "5' 6" because he was "the smallest one growing up in Booker T when he was growing up back in the day." *See* RR, Vol. 3, pg. 187.

Mr. Solomon said he walked in the store, and Rahim said to him, "we need to talk." *See* RR, Vol. 3, pg. 32. Rahim admitted that he confronted the victim. *See* RR, Vol. 3, pg. 68. So, they went outside. *See* RR, Vol. 3, pgs. 32, 38, 44, 66. Mr. Solomon said that Rahim started accusing him of having an affair with his wife. *See* RR, Vol. 3, pg. 32. *See also* RR, Vol. 3, pg. 77 (Rahim was upset and felt like Mr. Solomon was seeing his wife). Mr. Solomon said that Bobby Bostic, Jr. (Bostic), a friend of theirs, had been spreading those rumors. *See* RR, Vol. 3, pg. 32. Mr. Solomon met Rahim through Bostic, a veteran friend. *See* RR, Vol. 3, pg. 176. Mr. Solomon denied an affair (RR, Vol. 3, pg. 32) by saying, "No, I did not." *See* RR,

Vol. 3, pg. 175. *See also* RR, Vol. 3. Pg. 186.

At that time, Mr. Solomon said that Rahim started punching him and picked him up to slam him on the concrete. *See* RR, Vol. 3, pgs. 32, 44-45. "That's when he picked me up and he slammed me down on the concrete." *See* RR, Vol. 3, pg. 181. Harrison witnessed "him up in the air" (RR, Vol. 3, pgs. 159, 161), and "he dropped down . . . on the side of the concrete." *See* RR, Vol. 3, pg. 159. *See also* RR, Vol. 3, pgs. 168, 181-182, 191; State's Exhibit 10.

It appeared to Officer Milton that the defendant, Rahim, was a large and strong enough individual to have picked up and thrown down Mr. Solomon. *See* RR, Vol. 3, pg. 46. Officer Milton also talked to Rahim. *See* RR, Vol. 3, pgs. 37, 41-42. *See also* State's Exhibit 18. Officer Milton talked to Rahim in the "right backseat" of Officer Bigler's patrol car. *See* RR, Vol. 3, pg. 42.

During that conversation, Rahim said that he struck Mr. Solomon. *See* RR, Vol. 3, pg. 38. "There was gun mentioned but [Rahim] said that Mr. Solomon did not pull the gun on him." *See* RR, Vol. 3, pg. 38.

Mr. Solomon "was bent over holding his side." *See* RR, Vol. 3, pg. 44. *See also* RR, Vol. 3, pgs. 122, 188. Mr. Solomon "was wincing in pain

and appeared to be in a great deal of pain." *See* RR, Vol. 3, pg. 45. *See also* RR, Vol. 3, pg. 64 ("could tell by his facial expressions he was wincing in pain; he was holding his side."), pg. 167. According to Mr. Solomon, he was feeling "a lot of pain" (RR, Vol. 3, pg. 186), and he "could barely breathe." *See* RR, Vol. 3, pg. 189.

On two or three times, Officer Milton asked if Mr. Solomon need an ambulance. *See* RR, Vol. 3, pg. 45. "Each time he said no." *See* RR, Vol. 3, pg. 45. *See also* RR, Vol. 3, pg. 189.

Later, Mr. Solomon did get in the ambulance and go to the hospital. *See* RR, Vol. 3, pgs. 41, 44-45, 58, 132, 167, 189. Mr. Solomon went to Paris Regional Medical Center emergency room, where he was in the ICU at the hospital for at least four (4) days from November 20th to November 23, 2013. *See* RR, Vol. 3, pg. 94; State's Exhibit 17 (medical records). *See also* RR, Vol. 3, pgs. 94-99, 190.

Officer Milton went to see Mr. Solomon in the hospital to check his injuries. *See* RR, Vol. 3, pg. 45. Other than being upset, Officer Milton did notice some spots of blood and a cut on one hand. *See* RR, Vol. 3, pg. 45. *See also* RR, Vol. 3, pgs. 47-50; State's Exhibits 1-8. Officer Milton spoke with Mr. Solomon's doctor, who said he had fractured ribs and a collapsed

lung and would need to see a surgeon. *See* RR, Vol. 3, pg. 50. *See also* RR, Vol. 3, pg. 169.

After Mr. Solomon left the hospital, he was still in pain. *See* RR, Vol. 3, pg. 191. Mr. Solomon carried a cane for at least five months. *See* RR, Vol. 3, pg. 191.

Sergeant Brandenburg did not arrest the defendant, Rahim, that day. *See* RR, Vol. 3, pg. 57. Sergeant Brandenburg sent the case off to the Criminal Investigation Division (or "CID") because there were more witnesses that needed to be interviewed by CID. *See* RR, Vol. 3, pgs. 57, 75.

**Further Investigation by CID.**

James Mazy was a lieutenant and peace officer in the criminal investigation division with the City of Paris Police Department (Lieutenant Mazy). *See* RR, Vol. 3, pgs. 84-85. Lieutenant Mazy had a chance to investigate an incident that happened on November 20, 2013. *See* RR, Vol. 3, pg. 86.

Before Lieutenant Mazy could actually contact anyone, Rahim came to the police department. *See* RR, Vol. 3, pgs. 86-87; State's Exhibit 19. Rahim was not in custody, and he contacted Lieutenant Mazy voluntarily.

*See* RR, Vol. 3, pgs. 88-89.

On November 26, 2013, Lieutenant Mazy interviewed Rahim. *See* RR, Vol. 3, pg. 99. Lieutenant Mazy also interviewed Mr. Harrison and his wife at the same time. *See* RR, Vol. 3, pg. 103. Upon the conclusion of his investigation, Lieutenant Mazy concluded that Mr. Solomon was assaulted by Rahim. *See* RR, Vol. 3, pg. 99.

**<u>Jury Trial</u>.**

On August 5, 2014, the trial court presided over the voir dire proceedings. *See* RR, Vol. 2, pgs. 1-66. After challenges for cause and peremptory strikes, the trial court impaneled a petit jury of six regular jurors and one alternate. *See* RR, Vol. 2, pg. 69.

On August 13, 2014, the trial court proceeded with the jury trial in cause number 61685 by pre-admitting State's Exhibits 1-8, which were pictures, along with State's Exhibit 17, the medical records. *See* RR, Vol. 3, pgs. 7-8. The trial court then administered the oath to the jurors. *See* RR, Vol. 3, pg. 10.

After the trial court gave additional instructions to the jury (RR, Vol. 3, pgs. 10-16) and to the witnesses after the Rule was invoked, the State presented the charging instrument. *See* RR, Vol. 3, pgs. 18-19. Rahim

entered a plea of "not guilty." *See* RR, Vol. 3, pg. 19.

Following opening statements (RR, Vol. 3, pgs. 20-27), the State called Officer Milton as its first witness. *See* RR, Vol. 3, pg. 28. During his testimony, Officer Milton identified Rahim as the defendant in open court. *See* RR, Vol. 3, pg. 37. As its next witness, the State called Sergeant Brandenburg, who also identified Rahim as the defendant in open court. *See* RR, Vol. 3, pg. 63. The State's third witness, Lieutenant Mazy, also identified Rahim as the defendant in open court. *See* RR, Vol. 3, pg. 90.

The State called several additional witnesses and concluded with Mr. Solomon as its last witness. *See* RR, Vol. 3, pg. 199. Upon the conclusion of Mr. Solomon's testimony, the State rested. *See* RR, Vol. 3, pgs. 200-201.

As Rahim began his case-in-chief, defense counsel called Kameel McWilliams (McWilliams). *See* RR, Vol. 3, pg. 201. Following the testimony of McWilliams (RR, Vol. 3, pgs. 201-212), Rahim testified on his own behalf. *See* RR, Vol. 3, pg. 212-248. At the conclusion of his testimony, Rahim rested. *See* RR, Vol. 3, pg. 249. Subsequently, both parties rested and closed. *See* RR, Vol. 3, pg. 254.

Following a charge conference, the trial court inquired, "any objections, concerns, comments on the jury charge?" *See* RR, Vol. 3, pg.

255. The State voiced "[n]o objections or concerns regarding the jury charge, Your Honor." *See* RR, Vol. 3, pg. 255. Through defense counsel, Rahim voiced, "No objections, no concerns, Your Honor." *See* RR, Vol. 3, pg. 256. The trial court then read the court's charge to the jury. *See* RR, Vol. 3, pg. 257; CR, pgs. 54-56.

After closing arguments (RR, Vol. 3, pgs. 258-270), the jury retired to begin its deliberations. *See* RR, Vol. 3, pg. 270. Upon the conclusion of its deliberations, the jury reached a verdict. *See* RR, Vol. 3, pgs. 271-272. By its verdict, the jury found Rahim guilty of the offense of assault causing bodily injury, as charged in the information. *See* RR, Vol. 3, pg. 272; CR, pg. 57.

The trial court then proceeded with the punishment phase of the jury trial. *See* RR, Vol. 3, pg. 274. Upon the conclusion of the punishment phase, the State rested. *See* RR, Vol. 3, pg. 287. Rahim elected not to take the stand, and the defense rested. *See* RR, Vol. 3, pg. 287. Both sides rested and closed. *See* RR, Vol. 3, pg. 288.

The trial court then read its punishment charge to the jury. *See* RR, Vol. 3, pg. 289; CR, pgs. 58-60. After closing arguments (RR, Vol. 3, pgs. 290-293), the jury retired to begin its deliberations. *See* RR, Vol. 3, pg. 293-

294. Upon the conclusion of its deliberations, the jury reached a verdict. *See* RR, Vol. 3, pgs. 295-296. By its verdict, the jury assessed punishment at confinement for 365 days in the Lamar County jail and assessed a fine of none. *See* RR, Vol. 3, pg. 296; CR, pg. 61. Later, the trial court set an appeal bond and pronounced sentence. *See* RR, Vol. 3, pgs. 298-299.

On August 13, 2014, the trial court signed its final judgment of conviction. *See* CR, pgs. 62-64. Rahim timely filed his notice of appeal. *See* CR, pg. 65.

**Proceedings in this Court.**

On or about August 18th, Rahim filed his notice of appeal in this Court. The County Clerk of Lamar County filed the Clerk's Record on or about September 18, 2014. The official court reporter filed the Reporter's Record on or about December 1, 2014.

The appellant, Rahim, filed the first (of two) motions for extension of time to file his brief, which this Court granted initially until January 21, 2015. After this deadline, Rahim filed his brief on or about January 25, 2015 along with a second motion for extension of time, which this Court granted on January 27, 2015.

The State filed a motion for extension of time, which this Court granted on March 3, 2015. The State filed its brief on March 19, 2015.

## SUMMARY OF THE ARGUMENT

By this appeal, Rahim brings two (2) issues/points of error. This Court should overrule each of these issues/points of error for these reasons:

(1) Jury charge error did not exist in the present case because the extraneous-offense-evidence was admissible to rebut Rahim's defensive theory of self-defense and/or to show Rahim's intent. Because jury charge error did not exist, the present case should not involve an analysis for egregious harm; but even it did, Rahim could not prove egregious harm.

(2) This Court should order the trial court clerk (i.e. the County Clerk of Lamar County, Texas) to supplement this appellate record with a certified bill of costs. Once this Court has ordered and received this supplemental bill of costs, the evidence will be legally-sufficient to support the trial court's final judgment of conviction, which required the appellant (Rahim) to pay court costs.

In summary, this Court should overrule the appellant's, Rahim's, two (2) issues/points of error on appeal, and affirm the trial court's final judgment of conviction in all respects.

## ARGUMENT AND AUTHORITIES

**ISSUE PRESENTED IN REPLY NO. 1: JURY CHARGE ERROR DID NOT EXIST; OR IN THE ALTERNATIVE, THE APPELLANT, RAHIM, COULD NOT PROVE EGREGIOUS HARM.**

A.      **Standard of Review:  Egregious Harm.**

"[A]n affirmative denial of objection, as in this case, shall be deemed equivalent to a failure to object."  *See Bluitt v. State*, 137 S.W.3d 51, 53 (Tex. Crim. App. 2004).  "An appellant may raise such unobjected-to charge error on appeal, but may not obtain a reversal for such error unless it resulted in egregious harm."  *See id.*

In the present case, as in *Bluitt*, Rahim stated through his counsel, "No objections, no concerns, Your Honor."  *See* RR, Vol. 3, pg. 256.  Such an affirmative denial of objection should be deemed equivalent to a failure to object.  *See Bluitt*, 137 S.W.3d at 53.  Under *Bluitt*, Rahim may raise such unobjected-to charge error on appeal, but may not obtain a reversal for such error unless it resulted in egregious harm.  *See id.*

B.      **Jury Charge Error Did Not Exist:  The Trial Court Did Not Abuse its Discretion in Instructing the Jury That It Could Consider Evidence of the 2007 Assault.**

With his first issue/point of error, Rahim contended that the trial court erred when it instructed the jury in its charge that it could consider evidence

-16-

of the appellant's prior bad acts as evidence of his character because character was not an essential element of a charge or defense. *See* Appellant's Brief, pgs. 10, 14 (citing *Tate v. State*, 981 S.W.2d 189, 193 n. 5 (Tex. Crim. App. 1998)). In assessing jury charge errors, however, this Court must first determine whether error exists. *See Shipp v. State*, 331 S.W.3d 433, 443 (Tex. Crim. App. 2011).

In the present case, jury charge error did not exist because an extraneous offense may be used to rebut a defensive theory, such as self-defense, even though the purpose is not mentioned in Tex. R. Evid. 404(b). *See*, *e.g.*, *Robinson v. State*, 844 S.W.2d 925, 929 (Tex. App.--Houston [1st Dist.] 1992, no pet.) (citing *Crank v. State*, 761 S.W.2d 328, 341 (Tex. Crim. App. 1988); *Halliburton v. State*, 528 S.W.2d 216, 219 (Tex. Crim. App. 1975) (op. on reh'g); *Albrecht v. State*, 486 S.W.2d 97, 101 (Tex. Crim. App. 1972)). Citing *Halliburton*, it is well settled, according to this Court, that when an accused claims self-defense, the State, in order to show the accused's intent, may introduce rebuttal evidence of prior violent acts by the accused in order to show the intent of the person claiming self-defense. *See Jones v. State*, 241 S.W.3d 666, 669 (Tex. App.--Texarkana 2007, no pet.) (Lamar County); *Johnson v. State*, 963 S.W.2d 140, 144 (Tex. App.--

Texarkana 1998, pet. ref'd); *Armstrong v. State*, 850 S.W.2d 230, 236 (Tex. App.--Texarkana 1993), *aff'd*, 897 S.W.2d 361 (Tex. Crim. App. 1995).

As applied here, the trial judge initially recalled the testimony from a defense witness, who testified during Rahim's case-in-chief, along with the testimony from Rahim himself, and then ruled the following:

> I also recall that the young man who testified -- he was wearing the black shorts and the green shirt with the black glasses. He was, I think, the first Defense witness. I can't think of his name.
>
> MS. HAIRSTON: The little boy, Devon Washington?
>
> THE COURT: No. No.
>
> MR. BRANNAN: Kameel McWilliams.
>
> THE COURT: I believe that he testified that the Defendant was -- and I'm paraphrasing his words -- a peaceful, law-abiding citizen. I think that was the impression he left with the jury, that Defendant would not be the aggressor in this kind of a situation. So, I think we have had evidence -- and I believe the Defendant himself when he testified a while ago -- again, testified that he was a peaceful and law-abiding citizen. And I'm paraphrasing the testimony.
>
> So, I believe the Defendant' character for being a peaceful and law-abiding citizen is in issue and considering the self-defense claim, the State offering this evidence under 404 and 405, I believe that it is in fact relevant.

*See* RR, Vol. 3, pgs. 242-243.

-18-

As set forth above, the trial court did not abuse its discretion in "allow[ing] the State to ask questions regarding the 2007 assault" (RR, Vol. 3, pg. 243) because (1) the extraneous offense could be used to rebut Rahim's defensive theory of self-defense, *see Robinson*, 844 S.W.2d at 929; and/or (2) the State, in order to show Rahim's intent, could introduce rebuttal evidence of prior violent acts by the accused (Rahim) in order to show the intent of the person claiming self-defense. *See Jones*, 241 S.W.3d at 669; *Johnson*, 963 S.W.2d at 144; *Armstrong*, 850 S.W.2d at 236. For these reasons, the extraneous-offense-evidence was admissible, and the trial court did not err in instructing the jury that it could consider evidence of the 2007 assault. *See id*. Thus, jury charge error did not exist. *See Shipp*, 331 S.W.3d at 443. In conclusion, Rahim's first issue/point of error should be overruled, and this Court should not address his claim of egregious harm. *See* Appellant's Brief, pgs. 15-16.

C.     **Alternatively, Rahim Could Not Prove Egregious Harm.**

"[E]gregious harm is a difficult standard to prove and such a determination must be done on a case-by-case basis." *See Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011) (citing *Hutch v. State*, 922 S.W.2d 166, 172 (Tex. Crim. App. 1996)). "[T]he actual degree of harm

must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). This Court should examine any "part of the record as a whole which may illuminate the actual, not just theoretical, harm to the accused." *See Taylor*, 332 S.W.3d at 490. "Errors which result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *See id.*

In applying the law to this appellate record as a whole, Rahim could still not prove egregious harm because first, the entire jury charge correctly included a limiting instruction. *See* CR, pg. 55; *Graves v. State*, 176 S.W.3d 422, 433 (Tex. App.--Houston [1st Dist.] 2004, pet. dism'd) (extraneous offenses thus get a limiting instruction under article 38.37 during the guilt innocence phase). Second, the state of the evidence, including the contested issues and weight of probative evidence, was still strong even without the extraneous evidence of the 2007 assault because a number of eyewitnesses (Thomas, Washington, Harrison) still testified against Rahim and his version

of the November 20th events.  Third and finally, the argument of counsel for the State did not even mention the 2007 assault during the opening argument (RR, Vol. 3, pgs. 258-262), and the final closing argument had only a brief reference.  *See* RR, Vol. 3, pg. 268 ("You heard he had assaultive  behavior in the past.").

Viewing this record as a whole, Rahim could not establish any actual harm.  *See Taylor*, 332 S.W.3d at 490.  Accordingly, the appellant's, Rahim's, first issue/point of error should be overruled.

**ISSUE PRESENTED IN REPLY NO. 2:  THIS COURT SHOULD ORDER THE SUPPLEMENTATION OF THE CLERK'S RECORD TO INCLUDE A CERTIFIED BILL OF COSTS.**

A.    **Introduction.**

With his final issue, Rahim contended that the record did not contain a certified bill of costs; therefore, the appellant cannot be made to pay costs of court.  *See* Appellant's Brief, pg. 17.  In this regard, Rahim argued that since the record did not contain a certified bill of costs, a judgment against him for costs cannot be supported.  *See* Appellant's Brief, pg. 17.

B.    **Standard of Review:  Sufficiency of Evidence for Costs Assessment.**

An appellant in a criminal case may challenge the sufficiency of the evidence supporting court costs on direct appeal.  *See Armstrong v. State*,

340 S.W.3d 759, 766-67 (Tex. Crim. App. 2011). To measure the sufficiency of the evanesce supporting an award of court costs, this Court must view the record in the light most favorable to the award. *See Whatley v. State*, No. 06-12-00117-CR, 2014 WL 7399130, at * 1, 2014 Tex. App. LEXIS 13839, at * 2 (Tex. App.--Texarkana December 30, 2014, no pet.) (mem. op., not designated for publication) (citing *Mayer v. State*, 309 S.W.3d 552, 557 (Tex. Crim. App. 2010)). If a criminal action is appealed, the Texas Code of Criminal Procedure required that "an officer of the court shall certify and sign a bill of costs stating the costs that have accrued and send the bill of costs to the court to which the action or proceeding is transferred or appealed." *See* Tex. Code Crim. Proc. Ann. art. 103.006 (West 2006). Further, "[a] cost is not payable by the person charged with the cost until a written bill is produced or is ready to be produced, containing the items of cost, signed by the officer who charged the cost or the officer who is entitled to receive payment for the cost." *See* Tex. Code Crim. Proc. Ann. art. 103.001 (West 2006); *Ballinger v. State*, 405 S.W.3d 346, 348 (Tex. App.--Tyler 2013, no pet.). In addition, there is no requirement that a certified bill of costs be filed, either at the time the judgment is signed or before the case is appealed. *See Whatley*, 2014 WL 7399130, at * 1, 2014

Tex. App. LEXIS 13839, at * 2-3 (citing *Ballinger*, 405 S.W.3d at 348).

When a cost assessment is challenged on appeal, and the bill of costs has been omitted from the appellate record, then the clerk's record may be supplemented with the bill of costs. *See* Tex. R. App. P. 34.5(c)(1); *Johnson v. State*, 423 S.W.3d 385, 392 (Tex. Crim. App. 2014); *Whatley*, 2014 WL 7399130, at * 1, 2014 Tex. App. LEXIS 13839, at * 3; *Ballinger*, 405 S.W.3d at 348. In this situation, "supplementing the record to include the bill of costs is appropriate and does not violate due process." *See Ballinger*, 405 S.W.3d at 349.

C. **Application of Law to the Present Case.**

In *Randyael Dontrell Tyson v. The State of Texas*, No. 06-14-00114-CR, 2015 Tex. App. LEXIS 2506, at * 13-15 (Tex. App.--Texarkana March 18, 2015, n.p.h.), a recent appeal from Lamar County which raised a similar complaint to the one in the present case, this Court asked the County Clerk of Lamar County to prepare and file an itemized bill of costs. *See id*, 2015 Tex. App. LEXIS 2506, at * 15. In response, this Court received a supplemental clerk's record containing a certified bill of costs. *See id.* In *Tyson*, the itemized bill of costs showed that, excluding the fine that was also included as court costs, the total amount of court costs was $302.00.

*See id.* Because the supplemental record contained a bill of costs supporting the amount of court costs assessed, this Court in *Tyson* found that there was sufficient evidence to support the trial court's judgment for costs. *See id.*

As in *Tyson*, the same outcome and/or result should occur here. If not already requested, this Court should, again, ask the County Clerk of Lamar County, Kathy Marlowe, to prepare and file an itemized bill of costs. *See id*; Tex. R. App. P. 34.5(c)(1); *Johnson v. State*, 423 S.W.3d 385, 392 (Tex. Crim. App. 2014); *Whatley*, 2014 WL 7399130, at * 1, 2014 Tex. App. LEXIS 13839, at * 3; *Ballinger*, 405 S.W.3d at 348. In this situation, "supplementing the record to include the bill of costs is appropriate and does not violate due process." *See Ballinger*, 405 S.W.3d at 349. The State prays for such relief.

Once the supplemental record containing a bill of costs is received from the County Clerk of Lamar County, there should be sufficient evidence to support the trial court's judgment for costs in the amount of $302.00. *See Tyson*, 2015 Tex. App. LEXIS 2506, at * 15. Accordingly, the appellant's, Rahim's, second issue/point of error should be overruled.

# PRAYER

WHEREFORE PREMISES CONSIDERED, the State of Texas prays that upon final submission without oral argument, this Court order the trial court clerk to supplement the appellate record to include a certified bill of costs; and then affirm the trial court's final judgment of conviction, adjudge court costs against the appellant, and for such other and further relief, both at law and in equity, to which it may be justly and legally entitled.

Respectfully submitted,

Gary D. Young
Lamar County & District Attorney
Lamar County Courthouse
119 North Main
Paris, Texas   75460
(903) 737-2470
(903) 737-2455 (fax)

By:_____
    Gary D. Young, County Attorney
    SBN# 00785298

**ATTORNEYS FOR STATE OF TEXAS**

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure, the "Appellee's (State's) Brief" was a computer-generated document and contained 6275 words--not including the Appendix, if any.  The undersigned attorney certified that he relied on the word count of the computer program, which was used to prepare this document.

_____
GARY D. YOUNG
gyoung@co.lamar.tx.us

## **CERTIFICATE OF SERVICE**

This is to certify that in accordance with Tex. R. App. P. 9.5, a true copy of the "Appellee's (State's) Brief" has been served on the 19TH day of March, 2015 upon the following:

Don Biard
McLaughlin Hutchison & Biard LLP
38 First Northwest
Paris, TX   75460

_____
GARY D. YOUNG